# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### April 15, 2004 Session

## SAM SPICER, ET AL. v. STACE THOMPSON, ET AL.

Appeal from the Circuit Court for Rutherford County
No. 40350     Clara Willis Byrd, Judge

---

No. M2002-03110-COA-R3-CV **- Filed July 7, 2004**

---

Appellant Don Pickard appeals the action of the trial court finding that he defamed Sergeant Sam Spicer in public statements to the news media. Spicer cross appeals from the action of the trial court in dismissing his malicious prosecution action against Don Pickard, Stace Thompson and Howard Morris. We affirm the action of the trial court in the defamation case and affirm the action of the trial court in the malicious prosecution case as to Howard Morris. The malicious prosecution case against Don Pickard and Stace Thompson is affirmed in part and reversed in part. The case is remanded to the trial court for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit
Affirmed in Part and Reversed in Part**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, and FRANK G. CLEMENT, JR., JJ., joined.

James Douglas Kay, Matthew Brothers, Tom Price Thompson, III, Nashville, Tennessee, for the appellees, cross-appellants, Sam Spicer and wife, Karen Spicer.

Gregory Hall Oakley, Nashville, Tennessee, for the appellant, Don Pickard and, cross-appellees, Don Pickard, Stace Thompson and Howard Morris.

## OPINION

I.      Facts

A.      The principals

This case involves personnel of the Lavergne Police Department.

*Sam Spicer* was a full time police officer employed by the City of Lavergne since 1985. At the time of his termination in June of 1998, he had attained the rank of sergeant. *Karen Spicer*, wife of Sam Spicer, joined in his suit against Don Pickard *et al.*

*Don Pickard* became City Administrator of Lavergne in August of 1997 and remained in this position throughout the time period relevant to this case. He appointed *Dwayne Hicks*, a former Lavergne police officer, as Assistant City Administrator. *Stace Thompson*, a police officer employed by the Lavergne Police Department since 1989, was ordered by Don Pickard to investigate Sam Spicer.

*Mike Patrick*, Police Chief of Lavergne prior to mid-June of 1998, departed from that position in the course of Pickard and Thompson's investigation. *Howard "Butch" Morris* was Police Chief of the City of Lavergne from mid-June of 1998 through all other times relevant in this case.

Attorney *Ed Hiland*, represented Sam Spicer during the post-May 8, 1998 investigation until he withdrew from such representation when it became obvious he would be a witness.

*Malcolm "Skip" Elrod*, polygraph examiner was employed by Don Pickard to administer two polygraph tests to Sam Spicer. In the interim between the exams, Spicer, through Attorney Hiland, retained the services of *Charles Scott*, a private polygraph examiner to administer a polygraph test to Spicer.

Also appearing are:

1.  *Nick Watson*, a narcotics officer of the Lavergne Police Department in charge of the May 8, 1998 undercover drug operation;

2.  *J.R. Smith, a/k/a Sam Dixon*, an acquaintance of Don Pickard from East Tennessee, brought into Lavergne by Pickard as an undercover drug operative to purchase illegal drugs and lay the basis for the criminal charges involved in the May 8, 1998 drug sting;

3.  *Bobby Daingerfield*, patriarch of the Daingerfield family, former Lavergne police officer and operator of the "Pit-Stop" restaurant;

4.  *Sean and Billy Daingerfield*, teenaged sons of Bobby Daingerfield;

5.  *Twana Carr*, sister of Bobby Daingerfield;

6.  *George Peach*, boyfriend of Twana Carr;

7.  *Robert Wolfe*, Captain on the Lavergne Police Department and, as was the case with the other police officers, an employee at will. He was fired by Don Pickard in June of 1998;

8.  *Carol Burgeson*, confidential informant relative to the drug trade in Lavergne in January of 1998;

9.  *Jason Goforth*, young man in Lavergne found firing a stolen gun on September 4, 1997;

10. *William Timson*, Lavergne police officer first on the scene at the Goforth incident of September 4, 1997;

11. *Christopher Spradling*, narcotics detective at Lavergne Police Department to whom Jason Goforth was delivered by William Timson and Sam Spicer on September 4, 1997;

12. *Jimmy Ball*, investigator for the National Insurance Crime Bureau involved in the investigation of a stolen motorcycle incident;

13. *William Whitesell*, District Attorney General in Rutherford County;

B.      Police scandal and the beginning of the Spicer inquiry

In mid-1997, the Board of Alderman of Lavergne, Tennessee, being dissatisfied with the overall performance of the Lavergne Police Department, employed Don Pickard as City Administrator with instructions to straighten out the police department. When incumbent Police Chief Mike Patrick declined to make personnel changes, Mr. Pickard relieved him and took over the operation of the police department himself.

In efforts to combat the drug traffic in Lavergne Mr. Pickard employed J.R. Smith, a prior working acquaintance from East Tennessee, as an undercover agent. Smith took the assumed name of Sam Dixon and began to work his way into the local drug community. Pickard set up the undercover operation in the latter part of 1997 with Detective Nick Watson in charge and reporting directly to Pickard. Smith went undercover acting as a confidential informant and making various drug purchases from local dealers always using the code name Sam Dixon. Among the primary targets of the drug investigation were members of the Daingerfield family led by Bobby Daingerfield, a former Lavergne police officer who operated a restaurant in Lavergne known as the "Pit Stop." Sam Dixon worked himself into the confidence of the Daingerfield family, and while he did not testify at the trial, it would appear that he notified Nick Watson and Don Pickard that Sam Spicer "tipped off" some individuals who were targets of the drug investigation.

The undercover drug operation culminated in a wide scale drug bust on the morning of May 8, 1998. In the City of Lavergne courtroom, warrants were being issued beginning at 4:00 a.m. that morning and continuing throughout the day. Sergeant Spicer was not a part of the drug sting and was assigned to other duties. Spicer appeared at the city courtroom some time around 6 to 6:15 a.m. as the sting operation was beginning. He thereafter left the courtroom and went on patrol. He went to the Pit Stop Market for breakfast. Both Spicer and other officers of the Lavergne Police Department were regular customers of the Pit-Stop Market where they apparently received free meals from the Daingerfield family. Pickard, driving around before the sting operation commenced, observed Spicer's car and another patrol car at the Pit-Stop and, not wishing to have police vehicles at a place where arrests were to be made, wanted the cars moved. Spicer left the Pit-Stop after breakfast of his own accord and returned to his patrol duties. Nick Watson then went back to City Hall to inform Don Pickard that Spicer had been in the courtroom looking at warrants prior to having breakfast at the Pit-Stop and was "tipping off" people at the restaurant. When Spicer returned to police

headquarters he was confronted by Don Pickard about the "tipping off" allegations. Spicer vigorously denied that he had tipped off anybody about anything. Pickard immediately placed Spicer on administrative leave as of the morning of May 8, 1998. Immediately after the May 8, 1998 sting operation Pickard ordered Lavergne Police Officer Stace Thompson to investigate the allegations that Spicer had tipped off individuals at the Pit-Stop Market. He was ordered to report his findings directly to Pickard.

The allegations about "tipping off" drug dealers came primarily from alleged statements made by members of the Daingerfield family. During all of this time undercover agent Sam Dixon was very close to the Daingerfield family and was purchasing drugs from various members of the family. All of the members of the Daingerfield family were arrested in the May 8, 1998 drug sting. After the drug sting they all maintained that they were not talking about Sam Spicer but in fact about Sam Dixon. Twana Carr testified that she made it clear to Stace Thompson that she was talking about Sam Dixon and not Sam Spicer. Bobby Daingerfield testified:

> Q. Where were you when [Stace Thompson] questioned you?
> A. Once at the LaVergne City Police Department, once at the Rutherford County Sheriff's Department, and once at Morgan County Regional Facility, the penitentiary, the annex for Brushy Mountain.
> Q. Tell us about those conversations with Mr. Thompson.
> A. Well, Stace was asking me questions about Sam and if he'd ever told me - - if he had ever let me go when I had been arrested or should have been arrested and if I knew of any favors he had ever done for anybody or things of that nature.
> Q. And when we're talking about Sam, are we referring to Sam Spicer or Sam Dixon?
> A. At that point I knew he was talking about Sam Spicer. And I don't recollect the conversation. I mean, it changed at some point. At some point here in time I was talking about Sam Dixon, too, because I was still trying to be heard about this other Sam.
> Q. How did the conversation change to Sam Dixon?
> A. Well, I still would like to know what they intend to do about this man who has been buying my kids beer and cigarettes. He was a police officer, too. I knew they were trying to concentrate on Sam Spicer. I didn't know about Sam Spicer doing anything, but I did know about this other Sam.
>
> And that was when I informed him there was another officer involved. They'd asked me about Harry Hollins which was a police officer there in town, they'd asked me about things about him. And to the best of my memory, I don't remember ever telling them anything about Sam Spicer that was in any way with the intent, you know, making him believe that he was giving me information.

The other members of the Daingerfield family, Twana Carr, Sean Daingerfield and Billy Daingerfield, made it clear in their testimony at trial that Sam Spicer never tipped them off to anything, and that any pre-trial statements to the contrary actually involved Sam Dixon.

When it came to the attention of Thompson and Watson, after May 8, 1998, that Bobby Daingerfield, then incarcerated at Brushy Mountain Correctional Facility, had exonerated Sam Spicer relative to the "tipping off" charges, they went to the prison to confront him. Bobby Daingerfield testified that at this interview he told Thompson and Watson "and to the best of my memory, I don't remember ever telling them anything about Sam Spicer that was in any way with the intent, you know, making him believe that he was giving me information." The tape recording of the Brushy Mountain Correctional Facility interview, which was made by Thompson and Watson, disappeared before a transcript could be made.

C.      Expansion of the Spicer inquiry

Subsequent to May 8, the Thompson investigations expanded into areas that had nothing to do with the May 8, 1998 sting operation but was rather a reopening of matters predating the drug sting. These collateral matters have little to do with the defamation case but much to do with the malicious prosecution case. The first of these expanded Thompson investigations was concerned with the alleged theft of a motorcycle twelve years earlier. In late 1997, Jimmy Ball, an investigator for the National Insurance Crime Bureau, sought assistance from the Lavergne Police Department in the investigation of this allegedly stolen motorcycle. Sam Dixon had informed Twana Carr that this motorcycle, then in the possession of her boyfriend George Peach, was a stolen vehicle. Both Thompson and Spicer investigated the case though neither of them sought a search warrant for the vehicle. In conversation with Jimmy Ball Sam Spicer asked Ball what would happen if the motorcycle simply was found on the side of the road. Mr. Ball was not impressed with this statement by Spicer. The investigation at that point came to an end with Thompson testifying:

> THE COURT: So why didn't ya'll get a search warrant?
> THE WITNESS: If I remember right, Your Honor, the case was about
ten years old.

The second of these collateral investigations involved what we will refer to as the Jason Goforth incident. On September 4, 1997, Officer William Timson of the Lavergne Police Department was dispatched to an area where shooting of firearms was occurring and was met at the scene by Sergeant Sam Spicer. One of the persons firing the weapons was Jason Goforth, who was firing a weapon that was determined to have been stolen. Officer Timson was riding a bicycle and Sergeant Spicer had arrived in his patrol car. After interviewing Goforth and determining that the weapon had been reported stolen, Sergeant Spicer directed Goforth to drive his vehicle back to the police station with Sergeant Spicer following. Officer Timson rode his bicycle back to his own patrol car and returned to the police station. Spicer then turned Jason Goforth over to narcotics officer Christopher Spradling who interviewed Goforth at length. The interview concluded with Goforth agreeing to wear a wire recording attachment and try to interview the person from whom he had purchased the stolen gun. Goforth was not placed under arrest.

D.      Spicer's polygraphs

Following his suspension on May 8, 1998, Sergeant Spicer retained Ed Hiland of Nashville as his attorney.  Upon Spicer's insistence, a polygraph test was arranged for May 22, 1998.  The polygraph examiner, Malcolm "Skip" Elrod, was employed by Don Pickard and performed the examination.  The results of this examination were inconclusive, and Elrod informed Hiland and Spicer of the inconclusive results.  Elrod later advised Pickard and Thompson that while he could prove nothing he believed that Spicer had manipulated the test in a way that produced the inconclusive results.  Another polygraph test by Elrod was arranged for June 11, 1998.  In the interim Mr. Hiland arranged for Nashville polygraph examiner Charles Scott to administer a polygraph test to Mr. Spicer on June 8, 1998.  This test resulted in a finding that Spicer had answered all questions truthfully.  When Spicer and Hiland arrived for the June 11, 1998 polygraph test, Stace Thompson attempted to convert the polygraph test into a general interrogation involving some fifty questions.  Hiland objected to this procedure, and after the first proposed question was asked, he recessed the conference in order to speak with his client privately before the question was answered.  At this time the entire proceeding was recessed.  During this recess Thompson conferred with Pickard and Elrod, and when Spicer and Hiland reappeared Thompson terminated the interrogation saying that he would simply take the matters to the grand jury.  Spicer was never attached to the polygraph machine, never put under oath, and never questioned by the polygraph examiner.  Six days after the June 11 aborted polygraph test Don Pickard made the statements to the press which form the basis of this defamation action.

Thereafter Stace Thompson, at the instruction of Don Pickard, prosecuted Sam Spicer for the Jimmy Ball-motorcycle incident and the Jason Goforth incident which prosecution resulted in the four count indictment of November 4, 1998.

II.      Defamation of a Public Figure

A.  The law - defamation

Certain near universal rules of law form a backdrop for our consideration.  The law of defamation consists of the twin torts of libel and slander.  *Lara v. Thomas*, 512 N.W.2d 777 (Iowa 1994); *Batt v. Globe Engineering Co.*, 774 P.2d 371 (Kan.Ct.App. 1989).  "It is reputation which is defamed, reputation which is injured, and reputation which is protected by the law of defamation." 50 Am.Jur.2nd *Libel and Slander* § 2 (1995); *see also Gobin v. Globe Publ'g Co.*, 649 P.2d 1239 (Kan. 1982).

As regards a private person, "To establish a prima facie case of defamation in Tennessee, the plaintiff must establish that:  1) a party published a statement; 2) with knowledge that the statement is false and defaming to the other; or 3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement.  *See* Restatement (Second) of Torts § 580 B (1977); *Press, Inc. v. Verran*, 569 S.W.2d 435, 442 (Tenn.1978)."  *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999).

Defamation law in the modern age seeks to strike a balance between two competing principles, those being the right of the individual to protect his good name and the freedom of speech guaranteed by the First Amendment to the Constitution of the United States.

It has been observed by the Supreme Court of the United States:
Since the latter half of the 16th century, the common law has afforded a cause of action for damage to a person's reputation by the publication of false and defamatory statements. *See L. Eldredge*, Law of Defamation 5 (1978).
In Shakespeare's Othello, Iago says to Othello:
"Good name in man and woman, dear my lord,
Is the immediate jewel of their souls.
Who steals my purse steals trash;
'Tis something, nothing;
'Twas mine, 'tis his, and has been slave to thousands;
But he that filches from me my good name
Robs me of that which not enriches him,
And makes me poor indeed." Act III, scene 3.
Defamation law developed not only as a means of allowing an individual to vindicate his good name, but also for the purpose of obtaining redress for harm caused by such statements. *Eldredge, supra*, at 5. As the common law developed in this country, apart from the issue of damages, one usually needed only allege an unprivileged publication of false and defamatory matter to state a cause of action for defamation. *See, e.g.*, Restatement of Torts § 558 (1938); *Gertz v. Robert Welch, Inc.*, 418 U.S., at 370, 41 L.Ed.2d 789, 94 S.Ct. 2997 (White, J., dissenting) ("Under typical state defamation law, the defamed private citizen had to prove only a false publication that would subject him to hatred, contempt, or ridicule"). The common law generally did not place any additional restrictions on the type of statement that could be actionable. Indeed, defamatory communications were deemed actionable regardless of whether they were deemed to be statements of fact or opinion. *See, e.g.*, Restatement (Second) of Torts, *supra*, §§ 565-567.

*Milkovich v. Lorain Journal Co.*, 497 U.S. 111-13, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).

To temper this harsh rule of the common law with its obvious inhibition to freedom of expression, a parallel rule developed.

In 1964, we decided in *New York Times Co. v. Sullivan*, 376 U.S. 254, 11 L.Ed.2d 686, 84 S.Ct. 710, 95 ALR2d 1412, that the First Amendment to the United States Constitution placed limits on the application of the state law of defamation. There the Court recognized the need for "a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'-- that is, with the knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S., at 279-280, 11 L.Ed.2d 686, 84 S.Ct. 710, 95 ALR2d 1412. This rule was

prompted by a concern that, with respect to the criticism of public officials in their conduct of governmental affairs, a state-law " 'rule compelling the critic of official conduct to guarantee the truth of all his factual assertions' would deter protected speech." *Gertz v. Robert Welch, Inc.*, 418 U.S., at 334, 41 L.Ed.2d 789, 94 S.Ct. 2997 (quoting *New York Times, supra*, at 279, 11 L.Ed.2d 686, 84 S.Ct. 710, 95 ALR2d 1412).

*Milkovich v. Lorain Journal Co.*, 497 U.S.1, 110 S.Ct. 2695, 111 L.Ed.2d 1, 14-15 (1990).

Regarding a public official or public figure, Tennessee follows section 580(a) of the Restatement of Torts providing:

§ 580A. *Defamation of Public Official or Public Figure.* One who publishes a false and defamatory communication concerning a public official or public figure in regard to his conduct, fitness or role in that capacity is subject to liability, if, but only if, he
>  (a) knows that the statement is false and that it defames the other person, or
>  (b) acts in reckless disregard of these matters.

*Press, Inc. v. Verran*, 569 S.W.2d 435, 442.

The "actual malice" requirements of the landmark case of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and its progeny are controlling in this case. The Tennessee rules were clearly set forth by Chief Justice Henry in *Press, Inc. v. Verran*, 569 S.W.2d 435 (Tenn. 1978). The heart of the *New York Times* rule says, "the constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proved that the statement was made with 'actual malice' - - that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254 at 279-80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).[1]

In the words of the Supreme Court of Tennessee:

There may be no liability without fault, but the more highly placed the individual, the greater is the required degree of fault. The escalating range is from the individual engaged in private pursuits, whose cause of action is to be tested by conventional negligence standards, up to public officials engaged in public duties, where the 'knowledge - or - reckless disregard' rule indicative of actual malice is the constitutional criterion.

*Press, Inc. v. Verran*, 569 S.W.2d 435, 440-41 (Tenn. 1978).

---

[1] The rule was extended to "public figures" by *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

In determining the truth or falsity of a statement in the law of defamation the Supreme Court of the United States has held:

> The common law of libel takes but one approach to the question of falsity, regardless of the form of the communication. See Restatement (Second) of Torts § 563, Comment c (1977); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 776 (5th ed 1984). It overlooks minor inaccuracies and concentrates upon substantial truth. As in other jurisdictions, California law permits the defense of substantial truth and would absolve a defendant even if she cannot "justify every word of the alleged defamatory matter; it is sufficient if the substance of the charge be proved true, irrespective of slight inaccuracy in the details." 5 B. Witkin, Summary of California Law § 495 (9th ed 1988) (citing cases). In this case, of course, the burden is upon petitioner to prove falsity. See *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 775, 89 L.Ed.2d 783, 106 S.Ct. 1558 (1986). The essence of that inquiry, however, remains the same whether the burden rests upon plaintiff or defendant. Minor inaccuracies do not amount to falsity so long as "the substance, the gist, the sting, of the libelous charge be justified." *Heuer v. Kee*, 15 Cal. App. 2d 710, 714, 59 P2d 1063, 1064 (1936); *see also Alioto v. Cowles Communications, Inc.*, 623 F2d 616, 619 (CA9 1980); *Maheu v. Hughes Tool Co.*, 569 F2d 459, 465-466 (CA9 1978). Put another way, the statement is not considered false unless it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." R. Sack, Libel, Slander, and Related Problems 138 (1980); *see, e.g., Wehling v. Columbia Broadcasting System*, 721 F2d 506, 509 (CA5 1983); see generally R. Smolla, Law of Defamation § 5.08 (1991). Our definition of actual malice relies upon this historical understanding.

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516-17, 111 S.Ct. 2419, 2432-33, 115 L.Ed.2d 447, 472-73 (1991).

It being conceded that Sergeant Spicer is a "public figure" within the meaning of the defamation rule, proof in support of his claim must conform to the "clear, cogent and convincing evidence" rule.

> The struggle with the standard for appellate review in cases involving the "clear, cogent and convincing evidence" rule has been long and arduous for reasons well stated by Justice Traynor's dissent in *Beeler v. American Trust Co.*, 24 Cal.2d 1, 147 P.2d 583 (1944). He observed:
>> This is not an ordinary civil case, however, for, as the majority opinion concedes, it was incumbent upon plaintiff to support his contention by evidence, "clear, satisfactory and convincing; explicit, unequivocal and indisputable." *Wehle v. Price*, 202 Cal. 394, 397, 260 P. 878, 879; *Goodfellow v. Goodfellow*, 219 Cal. 548, 554, 27 P.2d 898. While it rests primarily with the trial court to determine whether the evidence is clear and convincing, its finding is not

necessarily conclusive, for in cases governed by the rule requiring such evidence "the sufficiency of the evidence to support the finding should be considered by the appellate court in the light of that rule." *Sheehan v. Sullivan*, 126 Cal. 189, 193, 58 P. 543, 544; *see, also Moultrie v. Wright*, 154 Cal. 520, 98 P. 257. In such cases it is the duty of the appellate court in reviewing the evidence to determine, not whether the trier of facts could reasonably conclude that it is more probable that the fact to be proved exists than that it does not, as in the ordinary civil case where only a preponderance of the evidence is required, but whether the trier of facts could reasonably conclude that it is highly probable that the fact exists. When it holds that the trial court's finding must be governed by the same test with relation to substantial evidence as ordinarily applies in other civil cases, the rule that the evidence must be clear and convincing becomes meaningless. There is a contradiction in thus destroying the vitality of the rule while affirming its soundness.

*Beeler v. American Trust Co.*, 24 Cal.2d 1, 32-33, 147 P.2d 583, 600 Cal.1944) (Traynor, J., dissenting).

The Supreme Court of the United States addressed the problem underlying Justice Traynor's dissent in *Colorado v. New Mexico*, 467 U.S. 310, 315, 104 S.Ct. 2433, 2437-38 (1984). Said the Court:

[B]ecause our inquiry turns on the evidentiary material Colorado has offered in support of its complaint, we find it necessary to explain the standard by which we judge proof in actions for equitable apportionment.

The function of any standard of proof is to "instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *In re Winship*, 397 U.S. 358, 370, 90 S.Ct. 1068, 1075, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring). By informing the factfinder in this manner, the standard of proof allocates the risk of erroneous judgment between the litigants and indicates the relative importance society attaches to the ultimate decision. See *Addington v. Texas*, 441 U.S. 418, 423-425, 99 S.Ct. 1804, 1807-1808, 60 L.Ed.2d 323 (1979).

Last Term, the Court made clear that Colorado's proof would be judged by a clear-and-convincing-evidence standard. *Colorado v. New Mexico*, 459 U.S. at 187-188, and n. 13, 103 S.Ct. at 547-548, and n. 13. In contrast to the ordinary civil case, which typically is judged by a "preponderance of the evidence" standard, we thought a diversion of interstate water should be allowed only if Colorado could place in the ultimate factfinder an abiding conviction that the truth of

its factual contentions are "highly probable." *See C. McCormick*, Law of Evidence § 320, p. 679 (1954).

*Colorado v. New Mexico*, 467 U.S. 310, 315, 104 S.Ct. 2433, 2437-38, 81 L.Ed.2d 247 (1984).

*Estate of Acuff v. O'Linger*, 56 S.W.3d 527, 534-35 (Tenn.Ct.App. 2001).

Judge Farmer, speaking for this court gave these parameters of the "clear and convincing evidence" standard.

> This court recently attempted to describe the clear and convincing evidence standard, explaining that
>
> > [a]lthough it does not require as much certainty as the "beyond a reasonable doubt" standard, the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard. *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn.App. 1995); *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn.App. 1992). In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn. 1992); *O'Daniel v. Messier*, 905 S.W.2d at 188. Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *O'Daniel v. Messier*, 905 S.W.2d at 188; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn.App. 1985). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *Lettner v. Plummer*, 559 S.W.2d 785, 787 (Tenn. 1977); *Goldsmith v. Roberts*, 622 S.W.2d 438, 441 (Tenn.App. 1981); *Brandon v. Wright*, 838 S.W.2d at 536.
>
> *M.C.G.*, 1999 WL 332729, at *6 (quoting *Bingham v. Knipp*, No. 02A01-9803-CH-00083, 1999 WL 86985, at *3 (Tenn.Ct.App. Feb. 23, 1999) (*no perm. app. filed*)).

*In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn.Ct.App. 2000).

Deference to the trial judge on issues of credibility is a particularly troublesome consideration in the law of defamation. Over the vigorous objections of Justices Rehnquist, O'Conner and White, the United States Supreme Court foreclosed such deference in appellate review. Finding the "clearly erroneous" standard of review of F.R.C.P. 52(a) inadequate and inapplicable to appellate review of defamation findings, whether those findings were made by judge or jury, the supreme court mandated independent *de novo* appellate review. In differentiating between the "clearly erroneous" standard of F.R.C.P. 52(a) and what it refers to as "the rule of independent review" mandated by *New York Times Co. v. Sullivan*, the supreme court holds:

The difference between the two rules, however, is much more than a mere matter of degree. For the rule of independent review assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact, whether the factfinding function be performed in the particular case by a jury or by a trial judge.

. . . .

The requirement of independent appellate review reiterated in *New York Times Co. v. Sullivan* is a rule of federal constitutional law. It emerged from the exigency of deciding concrete cases; it is law in its purest form under our common-law heritage. It reflects a deeply held conviction that judges–and particularly Members of this Court–must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice."

*Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485 at 501, 510-11, 104 S.Ct. 1949 at 1959, 1965, 80 L.Ed.2d 502 at 516-17, 523 (1984).

Admittedly the determination of the United States Supreme Court on this question was the subject of vigorous internal dispute within the court. Justice Stevens wrote the majority opinion in which Justices Brennan, Marshall, Blackmun, and Powell concurred. Chief Justice Burger concurred in the judgment while Justices Rehnquist, O'Conner, and White strongly dissented, asserting the applicability of the "clearly erroneous standard of F.R.C.P. Rule 52(a)."

The seemingly all-encompassing language of the majority opinion in *Bose* has been the subject of many refinements and much interpretation, even within the Supreme Court itself, as the majority opinion of Justice Stevens shows in *Harte-Hanks, Inc. v. Connaughton*, 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). A separate concurring opinion by Justice White joined by the Chief Justice, together with separate concurring opinions by Justices Blackmun and Kennedy, and an extensive and strikingly expositive concurrence by Justice Scalia leave what seemed to be the decisive holding in *Bose* rather difficult to apply.

B. The factual basis of the defamation claim

In finding that Mr. Pickard had defamed Mr. Spicer the trial judge held that Pickard had actual knowledge that his statements to the press were false. We must now review the record and determine through our independent investigation thereof whether or not clear and convincing evidence establishes that Pickard either knew that his statements were false or that he made those statements in reckless disregard of the truth or falsity thereof.

-12-

As Plaintiffs must establish by clear and convincing evidence "actual malice" on the part of Mr. Pickard in order to recover for defamation, the primary inquiry must be - - to paraphrase Senator Howard Baker's celebrated inquiry of the Watergate era - - "what did Mr. Pickard know and when did he know it?"  In considering this record on the defamation issue, the time frame of the unfolding events is vital.  The drug sting, immediately after which Sergeant Spicer was placed on administrative leave by Mr. Pickard, occurred May 8, 1998.  The first Elrod polygraph examination occurred May 22, 1998.  The Charles Scott polygraph examination of Spicer occurred June 8, 1998.  The second Elrod polygraph examination occurred June 11, 1998.  The alleged defamatory articles appeared in the Daily News Journal on June 17 and 19 of 1998, in the Nashville Tennessean on June 18, 1998, and in the Rutherford Courier on June 25, 1998.

In holding Mr. Pickard's statements in these newspaper articles to be defamatory, the trial court stated:

> The most irresponsible thing that was done by any of the officials of the City of LaVergne was when Mr. Pickard, who was the designated employer - - designated employee by the City of LaVergne, the only one authorized to make press releases and/or to designate someone to make press releases on behalf of the police department, he involved the media and totally ruined Officer Spicer's reputation.
>
> . . . .
>
> Mr. Spicer was the one who insisted on taking the polygraph.
> The polygraph was set up by the TBI, and there's only a few questions that can be asked in a polygraph test.  However, as is usual practice between attorneys for defendants and the polygraph examiners, the attorney's entitled to review those questions, see if they are too open-ended, too open for interpretation, make sure that they are - - the questions are proper so they can have a valid polygraph result.
> There's a very good reason polygraph tests are not admissible in court.  Polygraph tests do not prove anyone's guilt or innocence.  Neither should they be used to prove their guilt or innocence to the public.
> In fact, the City of LaVergne in making statements to the press about Officer Spicer tried him and convicted him in the court of public opinion before he was even charged with a crime.  The charges that were later brought down by indictment had nothing to do with most of the statements made to the press, but basically the Court finds that on June 17, 1998, the city administrator, Don Pickard, made defamatory statements to the press, and thus began not only one incident, numerous incidents, incidences of defamation.
>
> . . . .
>
> Mr. Pickard had been with the department since December of '97.  Mr. Pickard knew that the statements he made to the press on June 17 were false.  I don't find he recklessly made them.  He knew they were false.  The evidence in the record

-13-

is that he was aware in early '98 about an allegation about a gun that Officer Spicer and Officer - - well, Officer Watson disagreed. Let me find my exact notes about this. I don't want to misquote this. I apologize, I've got a whole lot of notes.

All right. There was an interview with Mr. Pickard, Officer Watson, confidential informant. The confidential informant was brought in concerning back in early '98 that Officer Sam Spicer's reputation was attacked.

She wanted to advise Mr. Pickard, Officer Watson that those allegations were untrue, that he had not ever warned her about any drug dealer, she didn't know anything about him doing anything but being an excellent, truthful person, good officer for 15 years.

Mr. Pickard was present. He heard it. There are tapes to prove it, there are transcripts to prove it, he was there. Also, Mr. Pickard was present during the attempted second lie detector test.

When Mr. Pickard made these statements to the press in June of '98, he had already been provided with the results from the test.

Thankfully Mr. Spicer made a tape, he and his attorney, of that meeting. And through that tape it's obvious who was there and who knew what. The transcript is a part of this record. Officer Spicer never refused to take the polygraph test. He was still trying to cooperate when he left the room.

It's clear to me from reading the transcript Mr. Thompson was there, the investigator. He knew he'd already passed one polygraph. He knew which questions had been placed on that. Mr. Pickard knew about those polygraphs.

. . . .

The one who's guilty of the defamation is Mr. Pickard because, again, who asked or had the authority to have the chief make statements to the police - - to the press. It was Mr. Pickard. Mr. Morris only spoke after conferring with Mr. Pickard and Mr. Thompson. It was Mr. Pickard's responsibility for the damages to Officer Spicer here.

. . . .

Now, how many incidences are there of defamation? That's the question to be answered. Beginning with the first - - let me get my original exhibits. All right, sorry. Trial Exhibit Number 12. . . .

[T]hird paragraph says, Spicer was fired on Thursday after he refused to answer certain questions during a polygraph test, City Administrator Don Pickard explained.

For the reasons I stated earlier, that was absolutely a false statement. He knew, he was there. Officer Spicer did not refuse to answer the questions during the polygraph test.

Now, there are some alleged defamatory statements that I don't find to be defamatory. For example, several police agencies have been involved in this.

-14-

That's not in and of itself defamatory. In context with the rest of this story it may be, but the statement by itself could be true based on interpretation.

It concerned several past incidents. We are also investigating a lot of allegations brought to us from various individuals and following up on the leads trying to verify them.

Was that statement true? If taken in context of the fact that he knew he'd already passed one polygraph and that some of these individuals had already recanted these statements or stated that they were in error, it was the wrong Sam they were talking about, they had already verified at that time that most of this information wasn't correct.

But I don't know that that specific statement saying several police agencies are involved, that appears to be at least partially true if you consider the TBI polygrapher an agency, and if you consider some insurance investigative agency a police agency, could be true.

And enough information to justify terminating. If the article without anything else just said, well, we had enough information, we just felt justified in terminating him, Spicer left, that wouldn't be defamatory. But in context with the rest of the statement that it's based on allegations and being the focus of criminal investigation, all of that makes it defamatory in that context.

Like I said, why didn't they just fire him like Captain Wolfe. Captain Wolfe they didn't destroy his reputation. But I think I got my answer to that question yesterday when I asked Mr. Pickard, and Mr. Pickard - - I asked him why they invited all the press that day, why they spoke only - - the drug raid, why did they invite all the press that day.

They wanted to improve the image of the police department. The article itself shows they're trying to show they're cleaning house. Personal gain, yes. Personal reputation, yes, for Mr. Pickard.

If the city looked bad before and he fires a "corrupt" police officer, it'd make him look good. He'd come in there and cleaned out the corruption. He wanted the press to know that. He's very open, very loud about it in terms of he kept talking to them.

Didn't stop with that occasion, kept talking to the press, kept repeating the same allegations. Caused Mr. Spicer untold humiliation.

Let me go through a few other allegations. June 18, Rutherford Courier. Again, questions. Several police agencies have been involved in this. Pickard said of the investigation, it concerns several past incidents. We are also investigating a lot of allegations brought to us from various individuals and are following up on the leads trying to verify them.

Nevertheless, Pickard said the city had enough information to justify terminating Spicer. The department is continuing to fully investigate the situation. Wolfe's termination coincided with the leaving of the outgoing chief, Mike Patrick, who left last week.

This is very important. "With the restructuring of the department, we decided we needed a new and different leadership in the police department," Pickard said. And then there was another article.

Like I said, as far as what Mr. Morris said, I don't think he's guilty of actual malice, but I find that Mr. Pickard is responsible in terms of having Morris speak to the press. He's the one that told him. And basically what the things Mr. Morris had said were repeated things that Officer - - that Mr. Pickard already stated to the press.

And then on Thursday June 25, the article in Rutherford Courier, Spicer a 15-year veteran of the force had been under suspicion of wrongdoing by department and city officials prior to his dismissal, and his refusal to cooperate with the May 22 test and thus the investigation gave the city ample reason for dismissal, Pickard said.

I don't know how you could be any more defamatory. And then Pickard said his attorney picked out seven questions they didn't want asked. I read the transcript of what happened that day. That's not true. Absolutely false.

These findings of the trial court were issued from the bench and incorporated into the final order of December 5, 2002.

We must now review the facts of the case and independently determine whether or not clear and convincing evidence establishes defamation to be "highly probable." *Acuff v. O'Linger*, 56 S.W.2d 527 (Tenn.Ct.App. 2001). The record establishes that aside from his own presence during the first Elrod polygraph of May 22, 1998, and during the recess of the second Elrod polygraph test of June 11, 1998, Pickard's sole sources of information about the polygraph test prior to the alleged defamatory press statements are conversations with Elrod and Thompson.

At this point, it is appropriate to address the inherent difficulties in reconciling deference to the better judgment of the trial court on matters of credibility with the "highly probable" requirements of the clear and convincing evidence rule. This case is so fact-sensitive that almost everything depends on credibility. On the question of credibility of Spicer *vis-a-vis* his accusers, the trial judge decisively came down on the side of Spicer and with good reason. While absolving the defendant Thompson of any kind of defamation, the trial court observed as to his investigation of Sergeant Spicer: "Now, I'm glad he's not a judge because I wouldn't want him to be a judge on my case because Mr. Thompson doesn't know how to listen to both sides of the story. He listens to one side and he takes that evidence and disregards everything on the other side of the story."

As to the witness, polygraph examiner Malcolm Elrod, his testimony speaks volumes. After determining that the May 22, 1998 polygraph test was "inconclusive" because of "erratic physiology, erratic tracing, erratic polygraph itself," he responds to the question of why they were erratic. He testifies:

Q.      Why were they erratic?
A.      You want an answer that I could prove or what I believe?

-16-

Q. Prove first.

A. I don't have any idea.

Q. Believe?

A. I believe Mr. Spicer made them erratic.

Q. What did he do to make them erratic.

A. Movements, deep breathing, such as that.

. . . .

Q. Did you make any allegations immediately after the test that Mr. Spicer was intentionally interfering?

A. To him?

Q. Yes, sir.

A. Not that I recall.

Q. Did you make those to Mr. Thompson?

A. After the test I believe I probably did.

Q. Did you tell Mr. Pickard?

A. Possibly or probably, I don't know.

. . . .

Q. Mr. Hiland asked you at this particular meeting after the test is administered why it was inconclusive?

A. I don't know.

Q. Did you tell Mr. Hiland that it could be a number of things?

A. That would be a normal answer, yes, sir.

Q. Did you tell Mr. Hiland that it could be, for instance, just a bad day?

A. Could have.

Q. Did you tell Mr. Hiland that it could have been the machine was having a bad day?

A. No.

Q. Did you give Mr. Hiland any other reason why it was determined to be inconclusive?

A. I don't recall. I could have told him a number of things, but I don't recall specifically what I told him no, sir.

Q. Did you ever make a statement to Mr. Hiland or Mr. Spicer that the results were inconclusive because Mr. Spicer interfered with the test?

A. I don't believe I did that day.

In response to the inquiry of counsel as to why Mr. Elrod did not provide this information to Mr. Hiland or Mr. Spicer, the witness Elrod favors us with the following amazing testimony:

Q. Why not?

-17-

A.      The goal was to give a test that would have conclusive results, either deceptive or nondeceptive.  One of the things that a polygraph examiner must do is try to appear to be [unbiased].  And if I told him that I believe they're inconclusive because your client is messing with me, it would put him on notice that I believe his client is not telling the truth which would not leave the impression that I would be [unbiased], and my attempts to get him to come back in for additional testing would not be very effective.

.  .  .  .

Q.      This is Exhibit Number 2 in this trial.  Can you identify that as the affidavit that you signed?
A.      Yes, sir.
Q.      Look at paragraph 3, please.
A.      Okay.
Q.      Read it out loud.
A.      The technical result of polygraph was inconclusive; however, based upon my observations of Mr. Spicer, his lack of cooperation with the test, and the totality of the circumstances surrounding the test, I was of the opinion that he was being untruthful.  Although, I cannot remember the exact conversations to the best of my recollection, I expressed my opinion concerning Mr. Spicer's dishonesty to Stace Thompson.
Q.      Why did you tell Mr. Thompson if you wanted to remain [unbiased]?
A.      I wanted to remain unbiased to Mr. Spicer.  I didn't want to remain unbiased to anybody else.

.  .  .  .

Q.      Were you able to give a fair test to Mr. Spicer this second time around?
A.      I think I could have if I would have had the opportunity.
Q.      Would you have been unbiased?
A.      Yes, sir, in the questions and the reading of the charts.  I don't have a choice in that.
Q.      Even though you had formulated an opinion as of the first test that Mr. Spicer was lying; correct?
A.      Correct.
Q.      I guess, then, I need to know if you think somebody is lying after the first test is inconclusive, are you leaning either way going into the second test or are you still totally unbiased?
A.      I'm going to appear unbiased, but yeah, I'm going to think that this guy appears to be untruthful, this guy wasn't cooperative, more than likely he is going to fail the second test.

Between the Elrod polygraph test of May 22 and June 11, 1998, Mr. Spicer had submitted to a polygraph test by Mr. Robert Scott on June 8, 1998, and in this test Spicer had been found to be completely truthful. After touting himself to be the best polygraph examiner in the State of Tennessee, Mr. Elrod voiced his opinion of polygraph examiner Scott:

> Q. Why don't you have a very high regard of him?
> A. I've run too many polygraph tests behind him and we've had opposite results.
> Q. And you were right and he was wrong?
> A. Well, it appears that way on some of them I've run. And some of the others I know of, that people have confessed after they had the second test when they passed his.

As observed by the trial judge, Stace Thompson did not get into defamation trouble because he kept his mouth shut.[2] Whatever may be the credibility problems involving Mr. Pickard's sources of information concerning the polygraph tests, these problems do not address directly the question relevant to actual malice - what Mr. Pickard knew and when he knew it. Focusing directly on this problem, the Daily News Journal story of Wednesday, June 17, 1998, asserts: "Spicer was fired on Thursday after he refused to answer certain questions during a polygraph test, city administrator Don Pickard explained." This statement is simply not true and Pickard knew that it was not true at the time he made it.

The sequence of events leading up to the June 17, 1998 statement is tedious but vital. On June 10, 1998, Edward L. Hiland, attorney for Sam Spicer, addressed a letter to Stace Thompson and Malcolm Elrod, which he hand-delivered to them prior to the time that the June 11 Elrod polygraph test was to begin. This letter is self-explanatory:

> Pursuant to my telephone conversation with Mr. Elrod on June 8, 1998, I feel it is now necessary to recite the history of our various dealings in the above referenced matter.
>
> On May 8, 1998, my client, Sgt. Sam Spicer was put on administrative leave with pay upon instruction from the city manager, Mr. Pickard, given to Chief of Police Michael G. Patrick. No specific charges were made in the notice given to Mr. Spicer. Chief Patrick classified them as "allegations . . . brought to Mr. Pickard's attention, which I have limited knowledge of at this time."

---

[2] The presence of the news media in this case, from the beginning, has been something of a puzzle. All defendants and employees of the City of LaVergne strenuously deny having notified any news media of the upcoming drug sting. It is with remarkable clairvoyance that the news media descended in mass at the LaVergne Police Department at 4:00 a.m. on the morning of May 8, 1998.

Prior to receiving the above notice, Sgt. Spicer had been called into a session with Stace Thompson where he was read his Miranda rights and given [a] limited recitation of some allegations made by unknown persons against him. Sgt. Spicer then elected to obtain counsel but further stated that he would be more than happy to undertake a polygraph test with regard to the allegations. He then went home. Sgt. Spicer contacted me almost immediately and I communicated by letter with Chief Patrick announcing my representation of Sgt. Spicer. I requested that Chief Patrick forward any questions for my client to my office. I would in turn meet with my client and respond promptly.

Upon receipt of my letter, and knowing of my representation, Detective Thompson contacted my client directly and demanded that he appear at the Police Department in LaVergne for a polygraph test on May 22, 1998. While I was concerned with the fact that the investigating officer by-passed me to contact my client[,] I still agreed, after consultation with my client, for Sgt. Spicer to appear for the polygraph. This was based almost completely upon the wish of my client to lay this matter to rest since he had nothing to hide.

My client and I appeared for the test at or about 10 a.m. on May 22, 1998. After extensive pre-test interview, Sgt. Spicer, myself and Skip Elrod agreed on the content and scope of certain questions which were to be asked. Certain of the allegations were not touched upon based on the decision of Skip Elrod. He stated that if "your client passes this test it is obvious that the rest of the allegations should be cleared. I was then asked to leave the room and Agent Elrod and my client remained in the testing room alone. My understanding upon leaving the room was twofold 1) a tape recording of the session would be done and provided to me and 2) we would be provided with the results of the test within 15 minutes of its completion and a report would be supplied to me.

After approximately one hour the test was completed. My understanding is that the test questions were altered slightly from those agreed upon. It is also my understanding that during the test, Agent Elrod lamented on several occasions that something was wrong with the blood pressure cuff and was regularly adjusting the cuff and having my client move his arm to different positions.

One and one half hours passed between the time my client's testing ended and we heard from Agent Elrod regarding the result. He stated that the test was inconclusive and wanted to retest my client that day. No specific reason was given for Agent Elrod's conclusion and no specific problems were given in spite of my inquiries. At this time it was necessary for me to be in Dickson County and my client and I left the premises with the understanding that we would investigate the possibility of scheduling a retest.

I informed Agent Elrod that I would probably consult another polygraph examiner for a test since his effort had failed. He informed both myself and my client that my client would just be wasting his money since he, Agent Elrod, was the best examiner in the entire State and that he knew that the efforts of other examiner's he knew would be of no consequence.

I was contacted on two occasions by Stace Thompson to reschedule a testing date. I also contacted by letter and fax both Agent Elrod and Detective Thompson to request the test results and a tape recording of the session. Specifically, I requested a list of the exact questions asked. I was informed that no recording was made and that, since the test was not over, no report would be made. Further, Agent Elrod informed me that by "State Law" I must request a copy of the report and submit a fee of $40.00, 30 days before the report would be provided.

At this point I began to feel that I probably needed to have my client tested by an independent examiner. Having had some experience with such testing, I was aware that several agencies, including the Davidson County District Attorney's office relied on examinations undertaken by Charles Scott. I contacted Mr. Scott and a test was completed on June 9, 1998, and Sgt. Spicer was completely exonerated by the results. I will be more than happy to provide a copy of the report upon its receipt.

Presently, Detective Thompson and Agent Elrod have scheduled another session for June 11, 1998. Considering the results of the first session and the fact that an independent tester has achieved a conclusion in his testing I would propose that we simply allow you to review these test results and make a determination as to your next step in this matter.

Sgt. Spicer has cooperated in every way in this matter and has suffered constant embarrassment, and anguish because of several unfounded allegations from unidentified sources. These sources were described by Detective Thompson as being unreliable and part of the criminal element. Therefore, I see no need to further prolong this matter.

It is respectfully requested that you conclude your investigation and that Sgt. Spicer be restored to his normal duties.

When Stace Thompson, Ed Hiland, Sam Spicer, and Malcolm Elrod gathered on June 11, 1998, for the second Elrod polygraph test, the proceedings were tape recorded. The transcript of those proceedings discloses the following:

> MR. THOMPSON: Today is the llth of June 1998, Detective Thompson 1591 internal affairs. I'm here with Ed Hiland, counsel for Sergeant Sam Spicer, LaVergne Police Department. Present and interviewing will be Special Agent Malcolm Elrod of the Tennessee Bureau of Investigation.

Sam, I want to talk to you about a couple of issues and I understand that you may consult your counsel before you're answering these questions. You have been read your rights, have you not?

MR. SPICER: That's correct.

MR. THOMPSON: You understand those rights?

MR. SPICER: Yes.

MR. THOMPSON: Having those rights in mind with your counsel present, do you still wish to answer questions?

MR. SPICER: Yes.

MR. HILAND: With regard to the - -

MR. THOMPSON: We'll ask a bunch of questions.

MR. HILAND: But not on the - -

MR. ELROD: No, No.

MR. HILAND: We're here today for something entirely different.

MR. THOMPSON: Not necessarily.

MR. ELROD: No, We need to clarify some issues before we go any further.

MR. THOMPSON: We're going to get down to some issues. Now, if you don't want your client to do that, I understand.

MR. HILAND: I don't know what it is. We're here for a lie detector test, or a polygraph test, not for anything else.

MR. THOMPSON: I told you yesterday, did I not - -

MR. HILAND: That you and I were going to have to talk about the other issues, and that's fine. I'll talk to you, but not until my client has had a chance - - I've asked - - in the first letter that I sent to Chief - - and I'm sorry, I keep forgetting his name, Michael Patrick, I asked for him to give me a list of the questions that he wanted to ask my client and I'd be happy to respond.

MR. THOMPSON: Well, an investigation is dynamic. It is not static.

MR. HILAND: Well, it is, if in fact you've got somebody that you haven't read their Miranda rights and their attorney hasn't told them to hush, don't say anything. That's where we are right now.

MR. THOMPSON: Here's where we are right now. We've got some questions to ask that go back as far as three years from today, maybe four years. We've got some questions to ask, specifically, that will go back to November of 1997. They all involve allegations of impropriety against - - is impropriety the right word. I have to be careful of my words. Allegations of conduct that appears to be not in keeping with the standards of law enforcement officers.

MR. HILAND: Who are the ones that made these allegations?

MR. THOMPSON: Mr. Jimmy Ball, Bobby Dangerfield, Bridget Dangerfield, Twana Carr. There are some witnesses in there that have not made any allegations. Do you want a copy of those people too?

MR. HILAND: Sure.

MR. THOMPSON: Okay. That's going to take me a while to compile. Also a Jason Goforth made an allegation. Are you prepared to answer those questions?

MR. HILAND: We have no idea what they are.

MR. THOMPSON: Why don't we just singly go through them and you can say yes or no.

MR. HILAND: If they ask a question, don't answer them until I tell you to.

MR. THOMPSON: Did you ever arrest Jason Goforth on September 4, 1997, for possession of a stolen handgun?

MR. SPICER: This is one of those kids that was in that deal. I recognize the name.

MR. HILAND: On what day?

MR. THOMPSON: September 4, 1997, at 18:24 hours.

MR. HILAND: Okay. want to give me a little - - you want to do it one at a time?

MR. THOMPSON: Sure, why not.

MR. HILAND: This is going to mean we're going to have to get up and go outside every time a question is asked. How many have you got?

MR. THOMPSON: Probably about 50.

MR. HILAND: Well, that comes down to an interrogation. I'm going to tell my client not to answer any. He came down here to - -

MR. THOMPSON: Okay. I'll tell you what we'll do. We'll throw out all this and we'll concern ourselves with the events surrounding the day of November 25, 1997. How about that?

It's a conversation that you had with NICB investigator, Jimmy Ball. Okay? It's some allegations that he's made, some notes that he's made, evidently, that you acted inappropriately in his investigation.

MR. HILAND: Let me talk to him. Come on outside.

(tape turned off)

(break taken)

MR. HILAND: Go ahead and ask that question.

MR. THOMPSON: In reference to that, I'm going to say this, Mr. Hiland. We're here to get the truth, with candor and honesty. I know you're here to represent your client. I have nothing against you. But we're entering into a situation again where we're going to be limited to asking questions and things like that. I think the best thing for us to do is just cease this interview and we'll go ahead and present our case to the grand jury.

MR. HILAND: That's fine.

MR. ELROD: Tape closed at 11:04.

The statements that Pickard admittedly made to the Daily News Journal of June 17, 1998 and to the Rutherford Courier in the article of June 25, 1998 stand in stark contrast to the truth as evidenced by the transcript of the proceedings on June 11, 1998.

-23-

The June 25, 1998 Rutherford Courier article provided:

> Former LaVergne Police Department (LPD) Sgt. Sam Spicer was dismissed from the force June 11 because he refused to answer seven specific questions from a Tennessee Bureau of Investigations (TBI) polygraph test, according to LaVergne City Administrator Don Pickard.
>
> Spicer, a 15-year veteran of the force, had been under suspicion of wrong-doings by department and city officials prior to his dismissal and his refusal to cooperate with the May 22 test- - and thus the investigation - - gave the city ample reason for dismissal, Pickard said.
>
> "His attorney picked out seven questions that they didn't want asked," Pickard said. "This sort of thing lets the papers and TV say that he answered all of the questions asked and that it was inclusive. The polygraph test didn't tell whether [he] told the truth or lied.
>
> But of the three TBI reviewers, one of the three said it was obvious that (Spicer) had not told the truth on some of the questions answered. The other two said it was inclusive."
>
> . . . .
>
> "(Spicer's) basic response was that it was an interrogation," Pickard said. "He wanted us to write down all of the questions and he and his lawyer would review them."
>
> Pickard said that refusing to answer any of the questions was "grounds for his termination."
>
> "He refused to cooperate with the last one," Pickard said, noting that requesting the questions in advance constituted a lack of cooperation in answering the prepared questions.

It is obvious from a cursory reading of the transcript of the June 11, 1998 second Elrod polygraph test that the statements Pickard made are false. Mr. Spicer and his attorney arrived for the June 11, 1998 polygraph test unaware of any claim by Mr. Elrod that Spicer had tried to deliberately sabotage the May 22, 1998 polygraph test. Mr. Spicer and his attorney came prepared to answer the same questions that had been asked by Mr. Elrod on the May 22 test. It was Mr. Thompson, over the initial objections of Mr. Elrod, who completely changed the ground rules for the polygraph test and wished instead to undertake an investigatory inquiry consisting of some fifty questions completely unrelated to the subject of the polygraph test. When Mr. Thompson took this approach, Mr. Hiland objected that he knew nothing about the questions that Mr. Thompson was seeking to ask. When Hiland sought to confer with his client, prior to his answering the first Thompson question which dealt with matters totally unrelated to the subject of the polygraph test, it was Mr. Thompson who abruptly terminated the proceedings by announcing "but we're entering into a situation again where we're looking to be limited to asking questions and things like that. I think the best thing for us to do is just cease this interview and we'll go ahead and present our case to the grand jury." Mr. Spicer was never sworn, never attached to the polygraph machine, never

administered any sort of test, and the whole proceeding was terminated not by Mr. Spicer, but by Mr. Thompson.

That Mr. Pickard knew exactly what was happening is clear from the record. The transcript of the June 11, 1998 polygraph test shows that when Mr. Thompson insisted on asking his fifty questions and, in fact, asked the only question that was ever asked of Mr. Spicer, attorney and client Hiland and Spicer retired from the room to talk about the question before answering. At this point the tape discloses "(tape turned off) (break taken)."

As to what happened in the polygraph room during this break when Hiland and Spicer were absent, Spicer testifies:

> Q. All right. How many questions did Mr. Thompson get to ask you?
> A. One.
> Q. And what was that question, sir?
> A. It was about a motorcycle. I'll have to read this. I believe the question was something to the effect of conversation that I had with Jimmy Ball. In my mind it was concerning the motorcycle.
> Q. Did you go outside and talk to Mr. Hiland?
> A. Yes, sir.
> Q. The tape - - the transcript reflects tape turned off, break taken. Do you recall how long that break was?
> A. It was less than five minutes because I had no problem answering the question.
> Q. When you came back in, what did Mr. Hiland say?
> A. When we came back in we walked back into - - I believe we walked outside the City Hall. I believe we walked back in front of the counter that was in front of Dwayne Hicks's office where the polygraph examination was being given. We went to walk in, the door was closed - - I don't know if it was completely closed, locked, but you couldn't see anything inside the office. And we had to wait probably 10, maybe 15 minutes, maybe 12 minutes, I'm not sure, for us to return in. And when the door opened up - -
> Q. Why did you have to wait 10 or 12 minutes?
> A. Well, the door was closed.
> Q. Did you knock to go in?
> A. No, sir. I believe we waited until the door was opened.
> Q. All right. When you went back in did Mr. Hiland ask, go ahead and ask the question?
> A. After the door opened and Mr. Pickard and Dwayne Hicks came out of the office, Mr. Hiland and myself went inside, and Mr. Hiland says, go ahead and ask your question.
> Q. Was Mr. Pickard and Mr. Hicks in the room when Mr. Hiland said, go ahead and ask that question?
> A. I do not believe they were, no, sir.

Q.     What were Mr. Hicks and Mr. - - do you know what Mr. Hicks and Mr. Pickard were doing in the room behind the closed doors for this 10 or 12 minutes that you were waiting?

A.     Just speculation.

Q.     Can't speculate.

A.     I didn't think so.

Q.     All right. After Mr. Hiland said go ahead and ask that question, is Mr. Thompson's response accurate on page 10 of the transcript?

A.     That's what he said.

Q.     What was your reaction when he said "I think the best thing for us to do is just cease this interview and we'll go ahead and present our case to the grand jury?"

A.     I don't know if I sighed - - I said something, but I just - - I couldn't believe it. I could not believe it.

The testimony of Mr. Elrod relative to the June 11, 1998 events could hardly be characterized as inconsistent with the testimony of Spicer.

Q.     Mr. Pickard there when you terminated it?

A.     Mr. Pickard was not in the room.

Q.     Did Mr. Pickard come in the room after you terminated it?

A.     Could have.

Q.     Mr. Pickard in the room prior to you terminating it at any time?

A.     Mr. Pickard might have been in and out of the room when Stace Thompson and I were setting things up or taking things down. Mr. Pickard was never in the polygraph - - or the office where I was doing the polygraph during any part of the interview with Mr. Spicer.

Q.     Why was the city administrator involved with this polygraph test?

A.     Because there was no chief of police.

When the trial court found that Mr. Pickard knew what had occurred at the June 11, 1998 polygraph test because "he was there," the record leaves little doubt that such finding was correct. He was there in the polygraph room in the absence of Hiland and Spicer and he was there in the presence of his two sources of information on the polygraph test, Thompson and Elrod. It is at the time of this conference that Thompson made his decision to terminate the test without either Elrod or Thompson putting any polygraph questions to Sam Spicer.

C.  Disposition of the issue of defamation

Sam Spicer was a 15 year veteran of the LaVergne Police Department. While his record is unblemished with past transgressions, it is correct to note that the record in this case discloses a seemingly questionable relationship between Spicer and the Daingerfield family, apparently deeply involved in the drug trade in the City of LaVergne. Mr. Goforth appears likewise to be a rather questionable acquaintance. Such relationships, however, are not necessarily indicative of un-

-26-

professional behavior by Mr. Spicer.  Given the relatively small community involved in the jurisdiction of the LaVergne Police Department and the necessary familiarity with all manner of persons in the community, the actions of Mr. Spicer are equally compatible with correct police behavior.  Representatives of the LaVergne Police Department led by Mr. Pickard converted suspicion, rumor, innuendo, and falsehood into a vehicle for ruining the reputation of Mr. Spicer. The law in this country requires more than suspicion to expose a public figure to ridicule and contempt.  Under our system of law a person cannot be carted away to the figurative guillotine on the denunciations of fellow citizens.[3]

In defense Mr. Pickard claims that he did not know anything but accepted unquestioningly what was told to him by Thompson and Elrod.  The record shows otherwise.  At the June 11 polygraph test, when Mr. Thompson confronted Hiland and Spicer with his fifty proposed questions in his sweeping investigation, and it became apparent that Mr. Hiland and Mr. Spicer would have to retire from the examination room on each question in order to confer prior to Spicer's answers, the participants "took a break" in the proceedings.  During this break, and in the absence of Mr. Hiland and Mr. Spicer, Mr. Pickard entered the polygraph test room and conferred for ten to fifteen minutes with Thompson and Elrod.  At the conclusion of this meeting, Mr. Pickard departed and Spicer and Hiland returned to the polygraph test room.  It was at this time that Thompson, not Spicer, terminated the test without Mr. Spicer ever having been sworn, even having been hooked up to the polygraph machine or ever having refused to answer questions.  Six days later, Mr. Pickard made the public pronouncements to the news media that form the bases of this action when he had to know that the statements were false.

Dissenting in *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), Mr. Justice Fortas observed:

> The First Amendment is not so fragile that it requires us to immunize this kind of reckless, destructive invasion of the life, even of public officials, heedless of their interests and sensitivities.  The First Amendment is not a shelter for the character assassinator, whether his action is heedless and reckless or deliberate.  The First Amendment does not require that we license shotgun attacks on public officials in virtually unlimited open season.  The occupation of public officeholder does not forfeit one's membership in the human race.  The public official should be subject to severe scrutiny and to free and open criticism.  But if he is needlessly, heedlessly, falsely accused of crime, he should have a remedy in law. *New York Times* does not preclude this minimal standard of civilized living.

390 U.S. at 734, 88 S.Ct. at 1327, 10 L.Ed.2d at 269 (1968).

While police officers are "public figures" within the *New York Times* rule they still retain their status as American citizens.  The case at bar reflects offensive conduct by Pickard far more

---

[3] Such was the fate meted out to Charles Darnay and by clandestine substitution visited upon Sydney Carton in Charles Dickens' "A Tale of Two Cities."

egregious than that which occurred in *Draghetti v. Chmielewski*, 626 N.E.2d 862 (Mass. 1994). In that case police officer Draghetti was a part-time teacher at the Massachusetts Criminal Justice Center. He suffered a back injury while on duty and his physician recommended four days rest. Under department policy police officers were forbidden to work while they were on the injury roster. Draghetti procured a substitute teacher but because the teacher was not experienced, Draghetti attended the class in case the substitute should need help. He did not submit a payment voucher for his appearance at the class and the substitute teacher was paid for teaching at the Academy that day.

An internal investigation resulted in a reference of the case to the district attorney for criminal investigation. Said the Supreme Judicial Court of Massachusetts:

> In fact, the internal investigation revealed that there was insufficient cause to warrant a criminal investigation. The September 26 article reported, "Chmielewski said there was evidence that Draghetti . . . intended to collect pay for teaching at the Academy while on duty." Collecting pay for teaching while on duty is a crime. Chmielewski's statements reasonably could be understood to mean that there was evidence that Draghetti intended to commit a crime. There was no such evidence. Imputation of a crime is defamatory per se. *Stone v. Essex Conty Newspapers, Inc.*, 367 Mass. 84, 853, 330 N.E.2d 161 (1975). Thus, Chmielewski's statements were susceptible of a defamatory meaning.

*Draghetti v. Chmielewski*, 626 N.E.2d 862, 866 (Mass. 1994).

The court upheld the $50,000 verdict in favor of Draghetti for defamation.

In *Posadas v. City of Reno*, 851 P.2d 438 (Nev. 1993), the court held:

> Posadas contends Bradshaw defamed him when Bradshaw accused Posadas in a press release of having "lied under oath." Although Posadas admitted, under oath, that he had lied to two police offices during an investigation, he never admitted to lying under oath. We find the wording of the press release to be ambiguous and susceptible to the false impression that Posadas had perjured himself.

851 P.2d at 442.

The behavior of Mr. Pickard is all the more egregious because Sergeant Spicer was an at-will employee of the City of LaVergne. All Pickard ever had to do was fire Spicer in the same manner that he fired Lieutenant Bob Wolfe. He chose another unfortunate and ill-advised course. Clear and convincing evidence establishes that Mr. Pickard made the post June 11, 1998 statements to the press knowing full well that such statements were false. The judgment of the trial court in relation to defamation will be affirmed.

III.     The Malicious Prosecution Claim

A.  The elements

The elements of a malicious prosecution are well settled:

> For a plaintiff to be successful in a malicious prosecution case growing out of an arrest for an alleged criminal act, it must be alleged and proved that: a criminal proceeding has been instituted by the defendant against the plaintiff; such proceeding terminated in favor of accused; there was an absence of probable cause for the proceeding; and, there was malice or a primary purpose other than that of bringing defendant to justice. *F.W. Woolworth Co. v. Connors*, 142 Tenn. 678, 222 S.W. 1053 (1920); *Pharis v. Lambert*, 33 Tenn. 228 (1853); Restatement of Torts, Wrongful Prosecution, Sec. 653; Prosser Law of Torts, 4th ed., Sect. 119.
>> Definitions of probable cause, however differently expressed, all agree in these two essentials: (1) The prosecutor must in good faith have honestly believed the accused was guilty of the crime charged; and (2) his belief must have been reasonable - - based on facts and circumstances sufficient to lead an ordinarily prudent person to believe the accused was guilty of the crime charged.  The prosecutor must have made the investigation an ordinarily prudent person would have made in the circumstances. *Thompson v. Schulz*, 34 Tenn. App. 488, 240 S.W.2d 252 (1940).

*Landers v. Kroger Co.*, 539 S.W.2d 130, 131-132 (Tenn.Ct.App. 1976); *see also Kerney V. Aetna Cas. & Sur. Co.*, 648 S.W.2d 247 (Tenn.App. 1982).

The entry of a *nolle prosequi* whether or not the defendant in the criminal case has been put in jeopardy is a sufficient termination in favor of the defendant in the criminal prosecution to comply with the rule in malicious prosecution cases that the underlying suit must have been terminated in favor of the defendant. *Scheibler v. Steinburg*, 129 Tenn. 614 (1914); *see also Christian v. Lapidus*, 833 S.W.2d 71 (Tenn. 1992).

Since it is undisputed in this case that Thompson at the instigation of Pickard was the prosecutor in the November 4, 1998 four count indictment of Sam Spicer and that Attorney General William Whitesell took a *nolle prosequi* of the case on May 5, 1999, albeit over the objections of Pickard, Thompson and Police Chief Morris, and that such *nolle prosequi* was the basis of the trial court order of June 2, 1999, dismissing the case; we are left to consider only the elements of malice and lack of probable cause.

Malice may be inferred from lack of probable cause but the reverse is not the case.  Lack of probable cause cannot be inferred from the existence of malice. *See Smith v. Hartford Mut. Ins.* Co., 751 S.W.2d 140, 143 (Tenn.Ct.App. 1987); *see also Nashville Union Stockyards, Inc. v. Grissim*, 13 Tenn. App. 115 (1930); *People's Protective Life Ins. Co. v. Newhoff*, 407 S.W.2d 190, 199 (Tenn.Ct.App. 1966).  Thus it is that probable cause is the linchpin of malicious prosecution. *Kerney v. Aetna Cas. & Surety Co.*, 648 S.W.2d at 251; *Carter v. Bakers' Foodright Store*, 787 S.W.2d 4,

6 (Tenn.Ct.App. 1989).  Even if malice be shown by the proof, an action for malicious prosecution cannot be sustained if probable cause for prosecution exists.  *F.W. Woolworth Co. v. Connors*, 142 Tenn. 678 (1919).

Generally as to malice and probable cause Tennessee law provides:

> To sustain an action for a malicious prosecution, there must not only be malice, but a want of probable cause.  In the absence of either of these requisites, the action falls to the ground.  Hence the want of probable cause for a prosecution is the test of this action.  Though malice exists, if in the estimation of a rational and dispassionate mind there be probable cause for prosecution, the action cannot be sustained.
>
> . . . .
>
> In the case of *Raulston v. Jackson*, 1 Sneed, 128, the court said:
>
> > The law on this point is, and should have been so charged by the judge, that if the jury found from the proof that the defendant, at the time he instituted the prosecution, acted upon such a state of facts known to him, or derived from reliable information, as would induce a belief in the mind of a prudent, discreet man that the crime had been committed and by the person he was about to prosecute, he was not liable.
> > The question is not whether the defendant is really guilty, but was there good and reasonable grounds for the prosecutor to believe he was. . . .
> > Instead of requiring direct evidence of the fact of the crime, it may certainly often happen that no crime was in fact committed, and yet the prosecutor justifiable, because of the existence of probable or reasonable grounds to believe the criminal act had been done, and by the accused.  If men were not allowed to act upon such grounds, crimes would often go unpunished for want of prosecutors.  This action is only intended to apply to cases where a criminal accusation is made against an innocent man through malice, and in the absence of even a fair and reasonable probability of its truth.

*Connors*, 142 Tenn. at 682-83, quoting *Kelton v. Bevins*, 3 Tenn. 90 (1812), and *Raulston v. Jackson*, 33 Tenn. 128 (1853).

Prior Tennessee cases holding that the existence of probable cause or the lack thereof presented a mixed question of law and fact, *Cohen v. Cook*, 224 Tenn. 729, 462 S.W.2d 499 (Tenn. 1970); *Louis v. Williams*, 618 S.W.2d 299 (Tenn. 1981); *Logan v. Koons Big K Corp.*, 676 S.W.2d

948 (Tenn. 1984), were overruled by the supreme court in *Roberts v. Federal Express Corp.*, 842 S.W.2d 246 (Tenn. 1992). Under *Roberts* probable cause presents an issue of fact to be decided by the trier of fact. The court in *Roberts* provides a similar description of the necessary lack of probable cause:

> A malicious prosecution is one brought in the absence of probable cause, and with malice. These two elements are distinct. Whereas malice concerns the subjective mental state of the prosecutor, appraisal of probable cause necessitates an objective determination of the reasonableness of the prosecutor's conduct in light of the surrounding facts and circumstances. *Accord Sheldon Appel Co. v. Albert & Oliker*, 47 Cal.3d 863, 765 P.2d 498, 506, 254 Cal.Rptr. 336, 344-45 (1989); Dobbs, *Belief and Doubt in Malicious Prosecution and Libel*, 21 Ariz.L.Rev. 607 (1979) (rejecting Restatement (Second) of Trots § 662 comment c (1977)).
>
> Properly defined, probable cause requires only the existence of such facts and circumstances sufficient to excite in a reasonable mind the belief that the accused is guilty of the crime charged. While a mind "be clouded by a prejudice, passion, hate and malice" is not "reasonable," *see Poster v. Andrews*, 183 Tenn. 544, 554, 194 S.W.2d 337, 341 (1946), the question whether a particular prosecutor is so motivated goes only to the element of malice. Probable cause is to be determined solely from an objective examination of the surrounding facts and circumstances.

*Roberts*, 842 S.W.2d, 246, 248.

Addressing now the linchpin of probable cause under the *Roberts'* determination that "probable cause is to be determined solely from an objective examination of the surrounding facts and circumstances." 842 S.W.2d at 248, two elements possibly affecting probable cause, advice of counsel and the effect of an indictment by grand jury, must be considered.

Advice of counsel is an affirmative defense:

> Thompson relies on advice of counsel as a defense. To make out this defense, the burden was on him to prove that he honestly sought such advice, that he fully disclosed to his counsel all the material facts he knew and all he could have known by reasonable diligence, that his counsel advised the prosecution, and that he acted in good faith upon such advice. *Nashville Union Stockyards, Inc. v. Grissim*, 13 Tenn. App. 115, 125; *Citizens Sav. & Loan Corp. v. Brown*, 16 Tenn. App. 136, 138-140, 65 S.W.2d 851, 852; *Cooper v. Flemming*, 114 Tenn., 40, 84 S.W. 801, 68 L.R.A. 849; *City v. Miller*, 1 Tenn. App. 1, 4; *Wilmer v. Rosen*, 102 W.Va. 8, 135 S.E. 225, 49 A.L.R. 261; Note, 11 Ann.Cas. 954, 955; 38 C.J. 479, 480, 54 C.J.S., Malicious Prosecution, § 84.

*Thompson v. Schulz*, 240 S.W.2d 252, 256 (Tenn.Ct.App. 1949).

The district attorney general is counsel whose advice can constitute a defense to a malicious prosecution action. *Cooper v. Flemming*, 114 Tenn. 40, 84 S.W. 801, 68 L.R.A. 849 (1904). This affirmative defense is dependent upon full, correct and honest disclosure to counsel of all material facts within the knowledge of the prosecutor or that could have been ascertained by reasonable diligence. This Court has held:

> But the party must state not only all material facts within his knowledge but all facts which he had reasonable ground to believe existed at the time of making the statement, or all material facts which he could have ascertained by reasonable diligence. 38 C.J., 433-4; 1 Cooley on Torts, 3 Ed., 328; *Cooper v. Flemming, supra*; *Railroad v. Greeson, supra*; *Mullins v. Hudson*, 2 Hig., 352; *Kendrick v. Cypert*, 10 Hump., 291.
>
> The presumption of law is that every prosecution is founded on probable cause and instituted only for purposes of public justice. 38 C. J., 386, 481. But this is as far as the presumption goes and the burden of proof is on the complainant to show that it relied on the advice of counsel, and it must further show that it made a full, correct and honest disclosure to counsel of all the material facts within its knowledge or that could have been ascertained by reasonable diligence, and that the advice was honestly sought and relied upon. 38 C.J., 479, 480.

*Union Stockyards, Inc. v. Grissim*, 13 Tenn. App. 115, 125 (1930).

While an indictment by a grand jury is said in some cases to allow a fact inference of probable cause such cases are in Tennessee at best questionable and neither indictment nor advice of counsel can be successful in defense unless the prerequisites to their applicability appear in the proof.

> We decline the defendants' invitation to adopt the rule that "the indictment of the accused by a grand jury, if unexplained, is evidence that the person who initiated the proceedings had probable cause therefor." 52 Am.Jur.2d *Malicious Prosecution* § 177 (1970). This rule is one of many rules on the subject and we are not convinced that it is either the best rule or that it is in conformity with the law of malicious prosecution in Tennessee. Where a finding is procured by fraud, false testimony, or where the defendant did not believe in the guilt of the plaintiff, an indictment is not sufficient to bar a suit for malicious prosecution. *Johnston v. Zale Corporation*, 484 S.W.2d 531 (Tenn. 1972). Neither is the advice of counsel a defense where the defendant has failed to make a full and honest disclosure of all the facts. *Mitchell v. George*, 63 Tenn.App. 408, 474 S.W.2d 131 (1971).
>
> At this point the element of maliciousness does not pose a problem for plaintiff. The absence of probable cause raises a rebuttable presumption of malice. It is settled law that malice may be inferred from the fact that a criminal prosecution was brought without probable cause. [Citations omitted.] The inference is not one of law but is a presumption of fact which may be rebutted, thus making malice an issue

to be decided by the jury where a criminal prosecution is instituted without probable cause. *Lewis v. Williams*, 618 S.W.2d 299, 303 (Tenn. 1981).

Malice may also be inferred from motives of the instigator. *Dunn v. Alabama Oil and Gas Co.*, 42 Tenn. App. 108, 299 S.W.2d 25 (1956).

*Kerney v. Aetna Cas. & Surety Co.*, 648 S.W.2d 247, 252 (Tenn.Ct.App. 1982).

The second, third, and fourth counts of the indictment against Sam Spicer provided:

SECOND COUNT

. . .

[SAM SPICER]

BEING A PUBLIC SERVANT, DID UNLAWFULLY AND KNOWINGLY OR INTENTIONALLY REFRAIN FROM PERFORMING A DUTY THAT IS IMPOSED BY LAW OR THAT IS CLEARLY INHERENT IN THE NATURE OF THE PUBLIC SERVANT'S OFFICE OR EMPLOYMENT, TO-WIT: BY RELEASING A PRISONER, JASON GOFORTH, WITHOUT AUTHORITY OF OFFICER WILLIAM [TIMSON], THE ARRESTING OFFICER, WITH INTENT TO OBTAIN A BENEFIT OR HARM ANOTHER, IN VIOLATION OF T.C.A. 39-16-402,

THIRD COUNT

. . .

BEING A PUBLIC SERVANT, DID UNLAWFULLY AND KNOWINGLY OR INTENTIONALLY REFRAIN FROM PERFORMING A DUTY THAT IS IMPOSED BY LAW OR THAT IS CLEARLY INHERENT IN THE NATURE OF THE PUBLIC SERVANT'S OFFICE OR EMPLOYMENT, TO-WIT: ATTEMPTING TO RETURN A STOLEN FIREARM TO JASON GOFORTH, THE PERSON THE FIREARM WAS SEIZED FROM, INSTEAD OF MAINTAINING SAID FIREARM AS EVIDENCE TO BE USED IN COURT AND THEN TO BE RETURNED TO THE OWNER, WITH INTENT TO OBTAIN A BENEFIT OR HARM ANOTHER, IN VIOLATION OF T.C.A. 39-16-102,

FOURTH COUNT

-33-

BEING A PUBLIC SERVANT, DID UNLAWFULLY AND KNOWINGLY OR INTENTIONALLY REFRAIN FROM PERFORMING A DUTY THAT IS IMPOSED BY LAW OR THAT IS CLEARLY INHERENT IN THE NATURE OF THE PUBLIC SERVANT'S OFFICE OR EMPLOYMENT, TO-WIT: BY FAILING TO FOLLOW THROUGH WITH THE ARREST PROCEDURES OF ONE JASON GOFORTH WHO HAD BEEN PLACED UNDER ARREST BY OFFICER WILLIAM [TIMSON], LAVERGNE POLICE DEPARTMENT, WITH INTENT TO OBTAIN A BENEFIT OR HARM ANOTHER, IN VIOLATION OF T.C.A. 39-16-402,

Counts two and four of the indictment are predicated upon the alleged fact that Jason Goforth had been placed under arrest by Officer William Timson on September 4, 1997. The proof shows that, except in the mind of Stace Thompson, the alleged 'arrest' never took place.

Officer Timson testifies:

        Q.      All right. did you investigate an incident on September 4, 1997, regarding Jason Goforth and the shooting of guns inside the city limits?
        A.      Yes.

        . . . .

        Q.      Exhibit 20? Exhibit 20, Officer Timson, is what I'm showing you. Can you identify that, please, sir?
        A.      Yes, sir. It's the supplement I wrote for the - - in reference to the case that day.
        Q.      Was it accurate at the time it was written?
        A.      Yes, sir.
        Q.      You stand behind it today?
        A.      Yes, sir.
        Q.      Can you read the last two sentences, last paragraph of that?
        A.      It says the case was turned over to Sergeant Spicer and Detective Spradling for further investigation and prosecution of the parties involved.
        Q.      When you were with Mr. Goforth out where there were rifles and guns and you'd actually responded to the call, was Mr. Goforth put under arrest by you or Mr. Spicer?
        A.      No, sir.
        Q.      Was there anything unusual or upsetting to you about Mr. Spicer taking Mr. Goforth back to the police station?
        A.      When I had asked Mr. Spicer to take Mr. Goforth back, he had had him just drive his personal vehicle back and meet us there due to me not having my patrol vehicle.

. . . .

Q. Did you ask Mr. Spicer to take Mr. Goforth back to the station?

A. I don't remember the exact wording, but I believe, yes, sir.

Q. Okay. You were on a bike; is that correct?

A. Yes, sir.

Q. Was there any other way to get Mr. Goforth back to the station other than Mr. Goforth driving his car or being transported by Mr. Spicer?

A. No, sir.

Q. How long did it take you to get back to the police station?

A. Probably somewhere 25 - - probably 20, 25 minutes.

Q. And when you got back, did you see Mr. Goforth?

A. Yes, sir.

Q. Where did you see him?

A. Him and Mr. Spicer were in - - at the time what was the interview room I believe it is.

Q. Was anybody else in the interview room?

A. At that time I don't recall.

Q. Did Detective Spradling interview Mr. Goforth that day?

A. Yes, sir.

Q. How long did that interview last?

A. I'm not sure exactly.

Q. Were you - - tell me your feelings about Mr. Spicer letting Mr. Goforth drive his own car back to the police department, what bothered you about that?

A. I felt it was out of the norm. We had Mr. Goforth, he was in possession of stolen property. My personal opinion was he should have been placed into custody and detained and charges brought against him.

Q. Were you mad at Mr. Spicer at the time for taking Mr. Goforth in like he did?

A. Yes, sir.

Q. Did you file any formal complaints with the police department?

A. I wouldn't say it was a formal complaint. I had spoke to I believe at the time it was Chief Patrick about it. And then it evolved into all this other stuff.

Q. Did Mr. Spicer violate any police protocol or rules or regulations by the way he transported Mr. Goforth back to the station?

A. Not that I'm aware of.

Q. Was there a state law that you're aware of that he violated by the way he transported Mr. Goforth back?

MR. OAKLEY: Objection. Asks for a legal conclusion.

THE COURT: I'll overrule that objection.

Q. After Mr. Goforth was interviewed - - do you know why he was interviewed by Detective Spradling?

A. No, sir.

Q. What did you do afterward to follow up on the prosecution or the stolen weapon that Mr. Goforth had?

A. I had talked to Mr. Spradling, Mr. Spicer a few times in reference to what was going on with it.

Q. All right. At a later time did you take matters in your own hands and get a warrant against Mr. Goforth?

A. Yes, sir.

Q. And what'd you do to do that?

A. I went down to the magistrate's office in Rutherford County, Murfreesboro and took out the warrant.

Q. And why did you do that?

A. Enough time had elapsed and nothing had been done with the case, so I was going to finish it out.

Q. And what was the conclusion of finishing out the case against Mr. Goforth?

A. The charges were dismissed due to failure to prosecute, not enough evidence.

On cross examination Officer Timson asserted that he considered Goforth to be under arrest but we are left with a mystery as to who arrested Jason Goforth.

Narcotics Officer Christopher Spradling testified:

Q. All right. Mr. Spradling, In 1997 through, let's say, June of 1998, what did you do with the LaVergne Police Department?

A. I was a narcotics officer.

Q. Do you recall an incident with a Jason Goforth on September 4, 1997?

A. Yes, sir, I do.

Q. Where were you at that time?

A. I was in my office at the police department.

Q. What happened?

A. That evening Sergeant Spicer brought Mr. Goforth to my office and advised me that he had been shooting near the lake and - -

Q. Why did he bring him into your office? You were a drug guy; correct?

A. Yes, sir.

Q. Not that you did drugs, you were over the drug department; right?

A. Right.

Q. Why did he bring him, Mr. Goforth, into your office?

A. To see if we could possibly obtain information on a stolen weapon that was found in his possession.

Q. What stolen weapon are we talking about?

A. The weapon that was in Mr. Goforth's possession when they found them shooting at the lake.

Q. Was Mr. Goforth under arrest?

A. Not at the time, no, sir.

Q. Was he handcuffed?

A. No, he was not.

Q. Did you have an interview with Mr. Goforth?

A. Yes, I did.

Q. How long did that interview take?

A. We were there a couple hours.

Q. Did Mr. Spicer stay the whole time or not?

A. He was in and out.

Q. Did Mr. Spicer - - was Mr. Goforth a prisoner?

A. Not to my knowledge, no.

Q. Was he a prisoner while he was in your office?

A. No, sir.

Q. All right. Was there anything unusual about Mr. Spicer bringing Mr. Goforth in for you to question him?

A. No, sir, it wasn't.

Q. Did you have any thoughts at the time that Mr. Spicer's having Mr. Goforth come into your office for questioning was wrong?

A. No, sir.

Q. Have you had any thoughts that it was wrong at a later time?

A. No, sir.

Q. All right. Was it out of the ordinary in the police department for Mr. Spicer to do that?

A. No, it wasn't.

Q. What about for any officer to do that?

A. No.

Q. After the meeting with Mr. Goforth or the interview was Mr. Goforth arrested immediately?

A. No, he wasn't.

Q. How did you end the interview in terms of dealing with Mr. Goforth and Officer Timson and Sergeant Spicer?

A. I left Mr. Goforth with a tape player, he was going to try to audiotape the person that he was saying stole the weapon. Or that he got the weapon from.

Q. He agreed to help you?

A. Correct.

Q. But what about the investigation on the weapon? What did you say to Mr. Spicer and Mr. Timson about what to do with Goforth?

A. I didn't really say anything to them at all. It was going to be their call.

Q. All right. And what happened with Mr. Spicer and Mr. Timson? did they do anything regarding Mr. Goforth or do you know?

A. Later on Mr. Goforth was arrested.

Q. All right. And who instigated that?

A. I believe Officer Timson.

Q. All right. Did you testify at Mr. Goforth's trial?

-37-

A.    Yes, I did.

Q.    And what did you testify to?

A.    That he did come into the police department and that he did try to help get the information from the party that he said stole the - - or that he bought the weapon from.

Q.    Did Mr. - - was Mr. Goforth found guilty or was he acquitted?

A.    He was acquitted.

Sergeant Spicer testified as to the Goforth incident:

Q.    Did you know any of the people?

A.    Yes.

Q.    Who?

A.    Jason Goforth.

Q.    How did you know him?

A.    Over the years I'd known him as he was growing up.  He lives about six or seven doors down from me when I lived in the city.   And as he grew up I would see him out and about in the city.

Q.    How old is Mr. Goforth on September 4, 1997?

A.    I would say early 20s.

Q.    Had you ever arrested him?

A.    No, sir.

Q.    Did he have a criminal - - was he a known criminal to the police department at that time?

A.    He was a hot item, especially for the drug officers because they felt he was involved.  I'd heard a couple officers say that they just missed Goforth or he must have gotten rid of whatever he had before they got there, but to my recollection, I don't believe he had ever been arrested.

Q.    Did you - - what'd you do with the guns?

A.    The weapons were taken back to the LaVergne Police Department.

Q.    Then did you call in to see if they were stolen or not?

A.    Yes, sir.  One of the guns that was there was a - - I believe it was a Ruger semiautomatic nine millimeter that had been reported stolen a few months prior to that day.

Q.    Is that a pistol?

A.    Yes, sir.

Q.    How did you get that information that it had been stolen?

A.    We called in dispatch to check the serial numbers on the weapons that were there, and that one came back a hit or stolen.

. . . .

Q.    Did you take him in - - was Mr. Goforth put under arrest?

A.    No, sir.

Q.      In September of 1997, if you put someone under arrest in LaVergne, what was the protocol?

A.      Place him in handcuffs, search him, and put him in the back of a patrol car.

Q.      Did you drive - - how'd you get to the police department?

A.      I followed Mr. Goforth in his vehicle.

Q.      All right.  Did you pat Mr. Goforth down?

A.      No, sir.

Q.      Was Officer Timson left at the scene or did he bicycle in?

A.      He bicycled out to go get his patrol car.

Q.      How long did it take to get from the Corp of Engineers site, you following Mr. Goforth back to the department?

A.      Seven to 10 minutes.

Q.      What did you do with Mr. Goforth when you got back to the department?

A.      We walked in the lobby, the front of the police department, and I had him sit down in the front while I went in and talked to Detective Spradling.

Q.      What did you tell Detective Spradling?

A.      I'd earlier called dispatch and told them to get him en route if it was at all possible.  I told him that Jason Goforth and a couple of his friends were found down at the lake shooting a weapon.

        One of the weapons come up, appeared to be stolen, and I felt it was a great opportunity to be able to use Jason Goforth and obtain some information, possibly about drug traffic in the City of LaVergne.

Q.      What was Officer Spradling's position at the Department on September 4, 1997?

A.      He was the detective primarily in narcotics.

        . . . .

Q.      Was the interview about drugs or guns or what?

A.      It started out to where Detective Spradling had started talking with him about where he got the weapon, if he could help him find out where he got the weapon from, that he may be able to work something out where he wouldn't be charged with a stolen weapon if he could prove or convince him that he was not the one that had stolen it.

Q.      Was Mr. Goforth talking or was he quiet?

A.      Oh, he was running his mouth.

Q.      Was he advised of his rights?

A.      No, sir, I don't recall that.

Q.      Was he ever placed under arrest while he was in your custody?

A.      No, sir.

Spicer, Timson, and Spradling were the only officers who knew anything at all about the Goforth incident. Stace Thompson was not present at any time, yet he insists in his testimony that Jason Goforth was under arrest during all the events that occurred on September 4, 1997.

Narcotics Detective Sergeant Nick Watson had originally complained to Mr. Pickard during the May 8, 1998 drug sting that Spicer had "tipped off" potential arrestees about the drug sting. At trial, Watson gave the following opinion concerning Spicer's handling of the Goforth incident:

Q.    All right. It was not improper procedure for Mr. Spicer to hand over Goforth to Detective Spradling, was it?
A.    It wasn't, but - -
Q.    You don't like it, but it wasn't improper, was it?
A.    It wasn't improper at all. Confidential informant, Counselor, a confidential informant - - if he wants to - - if he or she, Your Honor, if they're in trouble, if they see they're in trouble, you know, they want to cooperate.
      Our policy in narcotics, I've been working narcotics, we give them some length of time and that being, you know, that's - - you know, if they don't produce, if they don't do anything, you know, we go ahead and get the warrants. We'll talk to the DA about it.
Q.    Did you ever tell Mr. Thompson that it wasn't improper for Spicer to hand over Goforth to Spradling?
A.    Say it again now.
Q.    Did you ever tell Mr. Thompson that it wasn't - - that it was - - did you ever tell Mr. Thompson that it was okay for Spicer to hand Goforth over to Spradling for questioning?
A.    That I don't remember, but that's not improper.
Q.    Okay.
A.    If Mr. Goforth felt like he could do something, that's fine.
Q.    Did Mr. Thompson ever ask you whether or not [you] thought it was improper or not?
A.    No, that I don't remember if he did.
Q.    Do you have any idea why Mr. Spicer got indicted for that?
A.    Got indicted for that?
Q.    Yes.
A.    No, I don't.
Q.    Do you even know sitting here today without me telling you that he got indicted for it? Do you know that independently? Look at Count 2 of the indictment, sir. by releasing a prisoner, Jason Goforth, without authority of William Timson. Did you know that was part of the indictment?
A.    It was some of it. Like I said, Counselor, that was Mr. Thompson's - - you know, he was taking over the case.
Q.    It was his baby, wasn't it?
A.    And I worked narcotics.

While absolving Stace Thompson of liability for defamation because he "kept his mouth shut" the observations of the trial court as to his lack of objectivity in his investigation are clearly borne out by Thompson's own testimony:

Q. Mr. Thompson, was Jason Goforth a prisoner when he was taken from Officer Timson by Sam Spicer on September 4, 1997?

A. Yes.

Q. Was he under arrest when he was taken by Mr. Spicer to Officer Spradling?

A. From my information he was not free to leave to enjoy the liberties of a United States citizen. He was, in fact, under arrest.

Q. You could have gotten that information from Officer Spradling, couldn't you? He's the one that did the interview; correct?

A. I don't know what Mr. Spradling did other than his testimony today.

Q. The reason you don't know what he did is because you didn't interview him; isn't that right?

A. I did not interview him, no, sir.

Q. And what'd he say - -

THE COURT: Did you get this information from Officer Timson?

THE WITNESS: Yes, I did.

THE COURT: And Officer Timson did not tell you about Officer Spradling?

THE WITNESS: Yes, he did. Would you like me to explain, Your Honor?

THE COURT: Yes, please.

THE WITNESS: Sergeant Watson and Officer Timson were very irate that Officer Timson had made an arrest of an individual for possession of stolen property.

THE COURT: Well, is there an arrest?

THE WITNESS: According to what Officer Timson told me, yes, he had every intention of booking the individual and taking him to the county jail.

THE COURT: So Officer Timson, did he file an arrest report? Did you follow-up to see if he did that?

THE WITNESS: Yes, at a later date he did.

THE COURT: Why didn't he file it that day if he was maintaining he arrested him?

MR. KAY: We have that, Your Honor.

THE WITNESS: Your Honor, he was very angry. You've got to understand that Sergeant Spicer was his sergeant, and his concern was that Mr. Spicer had removed from his custody without consulting him his prisoner that he had - -

THE COURT: When was that filed?

. . . .

-41-

THE WITNESS: Officer Timson was on bike patrol out at the lake. Sergeant Spicer was in an office at the police department. He went to back Officer Timson up, not to be the responding officer, according to Officer Timson.

Officer Timson can't transport a prisoner on a bike. So he took Mr. Goforth to the jail or to the police department. When they - - when Timson gets his bike loaded on his car and back down to the police department, all this has transpired and he had no knowledge of it.

. . . .

Q.      Mr. Thompson, look at - -
THE COURT: So by the time he gets to the police department, is Mr. Goforth gone?
THE WITNESS: He's not in booking is the way Mr. Timson explained it to me.
THE COURT:  But you're hearing all this after the fact?
THE WITNESS:  Yes, ma'am.

. . . .

THE COURT:  Did you find any problem with the procedure Officer Spradling described?
THE WITNESS: Yes, I did.
THE COURT: What?
THE WITNESS: Well, Your Honor, if I arrest someone and you come in - - not meaning you as a judge, but another police officer, come in and take my prisoner and don't talk to me at all, I'm going to be upset. If I want to offer my prisoner over to narcotics for an interview, that's fine. It's done every day, but if somebody comes - -
THE COURT: Does he have any choice?
THE WITNESS: Yeah.
THE COURT: I mean, if the - - what do you call the, Drug Task Force walked in and saw him over there and said, hey, let us question this guy, let's see if he'll wear a wire, basically what happens here, and he's going to inform us - - he's going to wear this wire on this guy that sold him that gun. What's wrong with that?
THE WITNESS: I wouldn't find anything wrong if they approached me and asked me.
THE COURT: Haven't you lost your leverage if you go ahead and say, okay, let's go ahead and book you and then we'll think about releasing you with this tape recorder?
THE WITNESS: Well, Your Honor, in my experience it works both ways. If you arrest them and book them, you have a charge pending over him, you can always get it dismissed. If they fail to cooperate, it's already before the system, the court.

-42-

The other way you can - - I guess you could promise not to charge him, but sometimes you run into, you know, some people that are just going to disappear on you.

As there were only three officers, Spicer, Timson, and Spradling, that had personal knowledge of the Goforth incident of September 4, 1997, it would seem logical that Mr. Thompson, in his investigation, would at least interview Officer Spradling. He simply refused to do so asserting "credibility" problems with Officer Spradling. As to Officer Spradling Mr. Thompson testified:

Q.     Mr. Thompson, why didn't you interview Mr. Spradling about the incident with the prisoner, Mr. Goforth?
A.     At the time I wanted to interview Mr. Spradling, and I believe I had - - I either had difficulty finding him or it was the fact that I found out he was actually working for Mr. Spicer as a PI in the case.
Q.     Did he approach you in the hall of LaVergne Police Department like he testified and said do you need to interview me?
A.     Not to my recollection.
Q.     You don't remember that?
A.     No, sir.
Q.     You don't remember him ever volunteering to be interviewed?
A.     No, sir, I don't remember that.
Q.     Other than Mr. Goforth, Officer Timson and Mr. Spicer, who else was involved September 4, 1997, at the police department in interrogating Mr. Goforth?
A.     I don't know of anybody else.

. . . .

Q.     Did it peak your curiosity as to whether Mr. Spradling had any conversations with Mr. Spicer and what they were in your investigation?
A.     Yes.
Q.     Why didn't you ask Mr. Spradling, then?
A.     As I answered before, by the time I did, I either was unable to get ahold of him or had already discovered him working for him.
Q.     Well, even if he's working for him, why didn't you interview him?
A.     Well, if I thought that he was working for him, I would have approached the DA, somebody like that and advised them that he was their PI.[4]

. . . .

---

[4] Officer Spradling left the LaVergne Police Department at the beginning of 1998 by a "mutual agreement between myself and Mr. Pickard." At the time of the trial, (November 1998), he had returned to the LaVergne Police Department having been rehired by Officer Thompson's superiors and assigned to a patrol position subordinate to Officer Thompson. In the interim Spradling had been employed by Spicer as a private investigator in this case.

Q.      You testified in your deposition, did you not, that you have a problem with Mr. Spradling's credibility?

A.      Yes, I do.

In malicious prosecution cases where a defendant relies upon advice of counsel as a defense, he must establish that he has presented to the attorney general all material facts ascertainable by the exercise of due diligence. If he has done so and the attorney general then seeks and obtains an indictment, the defendant is not liable for malicious prosecution. Where he has not presented to the attorney general "a full and honest presentation of all material, ascertainable facts" the defense fails. *Perry v. Sharber*, 803 S.W.2d 223, 226 (Tenn.Ct.App. 1990).

Mr. Thompson testified:

Q.      There were some things, though, about Mr. Spradling that the district attorney didn't know, weren't there?

A.      I don't know.

Q.      You've testified you've given all the information to the district attorney, and what I think whatever - - that you'd given all the information to the district attorney; correct?

A.      Yes, sir. I gave it all of my case file.

Q.      You didn't interview Mr. Spradling?

A.      No, sir.

Q.      Do you think it would have been important for the district attorney to hear Mr. Spradling's opinion that Goforth was not under arrest? Do you think that would have been important, Mr. Thompson, or not?

A.      I believe - - I believe the district attorney talked to Mr. Spradling himself.

Q.      You don't know that for a fact, do you?

A.      No, sir, I don't.

Q.      All right. It would be, though, important in your investigation in giving the district attorney information that another officer in the department had a different opinion than you as to whether or not the arrest was done on Goforth or not? That'd be important information, wouldn't it?

A.      Another officer's opinion?

Q.      Another witness's opinion. It would be important, wouldn't it?

A.      I don't know if I'd say his opinion was important. Probably his recollections would be.

Q.      All right. And you never got his recollection to give the district attorney, did you?

A.      No, sir, I didn't.

Q.      It would also have been important - - an important factor for the district attorney to hear Mr. Spradling say that there was nothing wrong with what Officer Spicer did regarding Mr. Goforth. That would have been important, wouldn't it?

-44-

A. I believe I answered that under opinion, but I don't believe that his opinion would have been important, no.

Q. Even - - you don't even think that the district attorney would have liked to have heard his opinion?

A. As I stated, I don't know it to be a fact, but I believe here today that the district attorney did hear his opinion.

Q. I'm just asking you whether or not it would be important in your presentation to the district attorney of all the facts that another officer, that being Spradling, didn't think that Goforth was under arrest. Is it important or not?

A. Nope.

Q. Not important?

A. Not in my opinion, no.

Q. Why is it not important, Mr. Thompson, that another officer who actually interviewed the prisoner didn't think he was under arrest?

A. It's my opinion that because he was working for the Sprad - - for the Spicers as their investigator that his opinion would be tainted.

Q. Be tainted. He'd be lying; correct?

A. I don't know if he'd lie, but I didn't want to go there. Seemed like a conflict of interest to even talk to him about it.

Q. You didn't want to go there because you knew that Mr. Spradling might have information that would be different than what you were going to present to the district attorney; isn't that true?

A. No.

Q. You made a conscious decision, did you not, not to interview Mr. Spradling?

A. Yes.

Q. And you made that decision because you knew that he had a difference of opinion as to what had transpired with the Goforth event on September 4 and what you were presenting to General Whitesell? You knew that, didn't you?

A. The question - -

MR. OAKLEY: Objection. That's a compound question.

MR. KAY: Break it down then.

THE COURT: Break it down.


BY MR. KAY:

Q. You knew - - you didn't interview Mr. Spradling because you knew that he had a difference of opinion than you on whether or not Mr. Goforth was under arrest or not?

A. No.

Q. The only reason you didn't interview Mr. Spradling was because you thought he might be tainted because he was now working as Mr. Spicer's investigator?

-45-

A.     That's not the only reason.

Q.     What's the other reason?

A.     I couldn't get ahold of him for a while.

Q.     And the other reason was, you testified yesterday, you didn't think he was a credible person; correct?

A.     I - - you asked me after did I think he was a credible person. My answer was no, due to some personal matters.

The four count indictment against Sam Spicer was returned by the grand jury on November 4, 1998. On June 2, 1999, over the vigorous objections of Thompson and Police Chief Morris, District Attorney General William C. Whitesell, Jr. entered a *nolle prosequi.* The trial court found in no uncertain terms that all of the charges in the indictment against Sam Spicer were groundless and that, as to counts two and four of the indictment, Jason Goforth had never been placed under arrest in the first place. The evidence not only preponderates in favor of the findings of the trial court but is indeed overwhelming. However, the trial court found that since it was the attorney general who presented the case to the grand jury with resulting indictments, Plaintiff had failed to establish lack of probable cause. From this finding Spicer perfected his cross appeal.

The proof establishes without question that the prosecution of Spicer was at the instigation of Pickard and the insistence of Stace Thompson. While the defense insists that the prosecution was in fact that of Attorney General Whitesell the proof is to the contrary. Stace Thompson is the prosecutor on the indictment. The only two witnesses to testify before the grand jury were Stace Thompson and William Timson. The attorney general made no independent investigation of the case prior to going to the grand jury but relied on the information given to him by Stace Thompson. Particularly as to counts two and four of the indictment relative to the Jason Goforth incident, nobody told the attorney general prior to the return of the indictment that Jason Goforth was never placed under arrest by anyone. The prosecutor never told the attorney general that the policy followed by Spicer and Spradling in the handling of the Goforth case was a procedure generally used by the police department in undercover work particularly concerning narcotics. Attorney General Whitesell testified:

> I had been concerned from the very start that a lot of the evidence was subject to interpretation. I had waited quite a while to take the case to the Grand Jury. During this time - - and I'm not going to say I was prejudiced, but certainly Mr. Thompson, and I want to say probably Chief [Morris] too, would call in and inquire on the status of the case. And I got to the point where I decided, well, maybe the thing to do here is to present what we do have to a Grand Jury and let the panelists decide. That's what I did. They of course returned this indictment afterwards.

After the indictments had been returned against Spicer, General Whitesell had the "rare benefit" of the defendant and his attorney coming to him to discuss the facts of the case. Mr. Spicer appeared with his attorney Mr. Ed Hiland. General Whitesell testified concerning his actions after the conference "So after that conversation I concluded that the most I could say was that Mr. Spicer

had made errors of judgment, or that a jury would see it as errors of judgment. I decided [that] to go forward with the prosecution would not be beneficial for either side."

As Judge Felts stated in *Thompson v. Schulz, supra*, the defense of advice of counsel is an affirmative defense under which the burden of proof rests on the defendant. While for some reason only the first page of the defendant's answer appears in the record, we will assume that the defendants in this case relied upon this affirmative defense. Although advice of the attorney general can constitute a defense to a malicious prosecution action, *Cooper v. Flemming*, 114 Tenn. 40, 84 S.W. 801, 68 L.R.A. 849; *People's Protective Life Ins. Co. v. Neuhoff*, 407 S.W.2d 196 (Tenn.Ct.App. 1966), the defense requires full disclosure in order to succeed. *Perry v. Sharber*, 803 S.W.2d 223 (Tenn.Ct.App. 1990). At least as to counts two and four of the indictment any defense based upon advice of counsel fails under the proof in this case, and the trial court was in error in dismissing the malicious prosecution case as to these counts of the indictment.

As to counts one and three of the indictment we do not find that the evidence preponderates against the trial court's action in dismissing the malicious prosecution case. Count one involves an incident in which the hearsay statement of Jimmy Ball was presented to the grand jury by Stace Thompson, and the record further shows that at some point the attorney general interviewed Jimmy Ball. The record does not show, however, whether this interview occurred prior to or subsequent to the return of the indictment.

The trial court observed as to this count of the indictment:

Although, now we know this motorcycle had been stolen 12 years previously and there would have been no way they could have ever proven that anyone in possession of that motorcycle by this time had committed a crime or that it was illegal to possess it, even Mr. Thompson said, well, he realized it was 12 years old. So he didn't go try to get a search warrant. But anyway, Mr. Spicer is innocent of that count.

The charge on its face borders on being frivolous. However, the presence of Jimmy Carl Ball, agent for the National Insurance Crime Bureau, offers an independent basis for the attorney general to act on the charge. As to count one of the indictment the judgment of the trial court is affirmed.

As to count three of the indictment the proof in the record shows that at most Sam Spicer asked if the gun could be returned to Jason Goforth. No effort was actually made to return the gun Goforth. The attorney general says "that's not a crime I would prosecute." While the trial court found Sam Spicer to be "absolutely innocent" of the charge in count three of the indictment, that finding is not an answer to the question of whether or not the prosecutor withheld any information from the attorney general that would prevent him from relying on advice of counsel. It is difficult to glean from the testimony of Spicer, Watson, or anybody else whether the gun disclosed by the evidence was the stolen gun used by Jason Goforth on September 4, 1997, or the one used by him months later in repelling a break-in at his home. Given the difficulties of resolving that question we are not prepared to reverse the findings of the trial judge as to count three of the indictment.

-47-

While Police Chief Howard Morris was a moving force behind the prosecution of Sam Spicer it cannot be said from the evidence that he withheld any information from the district attorney general or that his actions rose to the level of malicious prosecution. Dwayne Hicks was voluntarily dismissed as a defendant by Plaintiffs. The judgment of the trial court as to Howard Morris is affirmed.

IV.    Damages

The trial court awarded Sergeant Spicer $1,000,000 in compensatory damages and awarded Karen Spicer $250,000 in damages for loss of consortium. In making these awards the trial court observed:

> Having found that Mr. Pickard is guilty of defamation and having found there has been clear and convincing evidence that he defamed Mr. Spicer, that it was with malice, intention, willful, guilty of some fraudulent acts, my next question is to determine damages.
>
> No amount of damages could compensate Mr. Spicer and Ms. Spicer for the conduct in this case. Life teaches us all there's nothing harder on a person than being accused of something they didn't do.
>
> You're hard on yourself if you do something wrong, you're hard on yourself if you get caught, but when you're accused of doing something wrong, that is the ultimate punishment, and that's what Mr. Spicer's [sic] had to endure for four years.
>
> His wife suffered loss of consortium, absolutely. The proof, I've got doctor bills, medical bills [totaling] about - - well, $4,850 based on the deposition of Dr. Marie Go. She testified about Officer Spicer's depression.
>
> I didn't have to have expert testimony to tell me he was depressed. I didn't have to have expert testimony to tell me he suffered humiliation and was unable to sleep, unable to eat, unable to go out. He testified. He was very credible, his wife was very credible.
>
> . . . .
>
> But I'm going to award Mr. Spicer $1 million. Like the Court said, there's no amount of money that can compensate a person for the loss of reputation, for the humiliation endured.
>
> I'm awarding him a dollar a day for his loss of reputation. That's not compensation. He's had four years he's put up with this, not to mention I haven't even gone into the fact that the press was called the day these indictments came down. And the indictments didn't amount to a hill of beans after it was all over.
>
> But after Mr. Spicer had called to say he was coming in, turning himself in, conveniently there's the press waiting to film him on that awful day when he had to face, accused in front of all his fellow men criminal wrong doings, things he didn't do.

On his wife's loss of consortium claim, loss of consortium is hard to compensate for because I know they're husband and wife, and it's been four long years based on [the] testimony of the of the doctor, Dr. Go, that he's been depressed.

His wife testified about how different he is, how she's basically had to keep him going, try to make him positive, couldn't make him positive, keep him going. But four years of loss of consortium, I'm going to award her $250,000.

Now, to the extent that this case will probably be appealed I would like to make some comments about - - or some findings about my reasons for awarding this amount of damages. Like I said, Mr. Spicer has suffered four years, in excess of 1,400 days of humiliation of being wrongfully accused.

This was his one chance to try to convince some authority that he was innocent, and no amount of compensation can compensate him for that. A million dollars wouldn't compensate him, but I believe a million dollars is reasonable considering all the facts in this case. Like I said, I can't make a finding on all those facts. That would be the judgment of the Court.

Now, I'm not awarding punitive damages in this case not because I don't feel any are not deserved but because the Court wants to try to compensate Mr. Spicer [] and his wife for this tremendous wrong that was done to a public servant.

As a general rule the amount of damages rests largely in the discretion of the trier of fact, whose findings are entitled to great weight on appeal.

The amount to be awarded in personal injury cases rests largely in the discretion of the trier of fact. *Shell Oil Co. v. Blanks*, 46 Tenn. App. 539, 548, 330 S.W.2d 569, 573 (1959). The amount allowable as damages for personal injuries in tort actions are not measured by fixed rules of law, but rest largely in the discretion of the trier of fact and is entitled to great weight in the appellate courts in the absence of a showing of fraud or corruption. *Blalock v. Temple*, 38 Tenn. App. 463, 470, 276 S.W.2d 493, 497 (1954). The amount allowable as compensation for personal injuries are not measured by fixed rules of law, but rest largely in the discretion of the trier of fact and damages in personal injury cases will not be disturbed on appeal unless amounts fixed are so excessive as to indicate passion, prejudice and caprice on the part of the trier of fact. *Finks v. Gillum*, 38 Tenn. App. 304, 319-20, 273 S.W.2d 722, 730 (1954).

*Coakley v. Daniels*, 840 S.W.2d 367, 372 (Tenn.Ct.App. 1992).

It has been said that "[i]n actions of defamation the wrong done to a plaintiff is peculiarly difficult to measure according to a money standard." *Edward Lamb v. Pat Sutton, et al.*, 164 F.Supp. 928, 931 (M.D. Tenn. 1958).

This Court has held:

Under Tennessee law, a plaintiff is required to prove actual damages in all defamation cases. *Handley v. May*, 588 S.W.2d 772, 776 (Tenn.App. 1979). The actual damage requirement was discussed by the United States Supreme Court in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974):

> We need not define "actual injury," as trial courts have wide experience in framing appropriate jury instructions in tort actions. Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury.

*Id.* at 349-50, 94 S.Ct. at 3012. The failure to prove special damages or out-of-pocket losses is not necessarily determinative. *Handley*, 588 S.W.2d at 776. The issue is whether the record contains any material evidence of impairment of reputation and standing in the community, personal humiliation, or mental anguish and suffering. *Id.*

*Myers v. Pickering Firm, Inc.*, 959 S.W.2d 152, 164 (Tenn.Ct.App. 1997).

In a closely analogous case the Supreme Court of South Carolina addressed a $250,000 actual damage and $500,000 punitive damage award to a police officer for defamation. In the case Assistant Police Chief Miller had been accused by fellow employee, Ms. Davis, of sexual harassment. G. F. Broom, city administrator, submitted Davis to a polygraph test which she failed. Miller then declined to take a polygraph test absent certain conditions. Broom thereupon concluded that Miller had in fact sexually harassed Davis when Miller refused the polygraph test. The court recited:

> As a result and in the presence of Salters and Jones, Broom declared that he had no choice but to conclude that Miller had sexually harassed Davis and had lied about it. Broom further explained that he was immediately suspending Miller and would recommend to the West Columbia City Council that he be terminated. The next day, *The State* newspaper printed an article regarding Miller's suspension. Two days later, Miller opted to retire effective December 31, 1988.

471 S.E.2d 683, 685 (S.C. 1996).

In upholding the jury verdict as to damages the court held:

> Broom's defamatory statement effectively destroyed Miller's reputation and ended his distinguished twenty-five year law enforcement career. Miller had been the assistant chief of police for seventeen years, and during this time he had received the highest awards available to law enforcement officers. However, after resigning from

the West Columbia Police Department, Miller had difficulty obtaining employment. When considering that a person's reputation is invaluable, we conclude that Broom has failed to establish that the verdict in this matter was grossly excessive. Therefore, the trial court did not err in denying Broom's motion for a new trial.

*Miller v. City of West Columbia*, 471 S.E.2d at 687.

The defamatory actions of Pickard effectively destroyed Spicer's fourteen year career as a police officer, saddled him with public ridicule, and otherwise humiliated him. Approaching middle age he was forced to seek other employment with loss of all benefits of his employment as policeman, including matching 401k retirement benefits and job satisfaction. Medical proof discloses that both he and his wife suffered depression and humiliation as a result of these actions.

The compensatory damage awards made by the trial judge in the amount of $1,000,000 to Sergeant Spicer and $250,000 to his wife Karen Spicer are a matter of much concern in this case. We cannot say from a careful study of the cold printed record in this case that we would have awarded damages in such amounts had we been vested with original jurisdiction in this case. This, however, is an appellate court and we review these damage awards with due deference to the discretion vested in the trial court. *Coakley v. Daniels*, 840 S.W.2d 367, 372 (Tenn.Ct.App. 1992).

For reasons set forth at length by this Court in *Mitchell v. Archibald*, 971 S.W.2d 25, 29-30 (Tenn.Ct.App. 1998), deference to the judgment of the trial court on credibility determinations is a time honored principle of appellate review.

> [A]ccordingly, appellate courts routinely decline to second-guess a trial court's credibility determinations unless there is concrete, clear, and convincing evidence to the contrary. *See Bingham v. Dyersburg Fabrics Co., Inc.*, 567 S.W.2d 169, 170 (Tenn. 1978); *Thompson v. Creswell Indus. Supply, Inc.*, 936 S.W.2d 955, 957 (Tenn.Ct.App. 1996).
>
> The most often cited reason for this principle can be traced to the fact that trial judges, unlike appellate judges, have an opportunity to observe the manner and demeanor of the witnesses while they are testifying. *See Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn.Ct.App. 1991).

*Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn.Ct.App. 1998).

In addition in cases involving liable and slander "the amount of damages assessed depends on the degree of moral turpitude of the defendant's conduct." *Saunders v. Baxter*, 53 Tenn. (6 Heisk.) 369, 385 (Tenn. 1871). *Myers v. Pickering Firm, Inc.*, 959 S.W.2d 152 (Tenn.Ct.App. 1997).

The conduct of Defendant Pickard in this case was egregious. The trial court had the opportunity to observe the manner and demeanor of the witnesses and in the first instance to judge the impact of the libelous publications on Plaintiffs. While the amounts awarded by the trial judge

are high in this case we cannot say that they are beyond the range of reasonableness. Accordingly we will not second guess the determination of the trial court in this respect. We cannot say that the trial court abused its discretion in setting damages.

V.      Conclusion

In this case we cannot say that Sam Spicer was a perfect police officer. There is however scant admissible evidence in this record to cast adverse reflection upon him. The law will not allow his reputation to be destroyed by innuendo, suspicion and falsehood. The judgment of the trial court as to defamation is affirmed.

On the malicious prosecution case the judgment of the trial court as to the defendant Howard Morris is affirmed. The judgment of the trial court in respect to counts one and three of the indictment is in all respects affirmed. The judgment of the trial court as to counts two and four of the indictment is reversed on the issue of lack of probable cause, this Court finding that the defense of advice of counsel is not sustained by the record.

Since the trial court rendered judgment for the defendants as to these two counts on the basis that the prosecution of the case by the attorney general established probable cause, that court did not address the separate issue of malice on the part of defendants Pickard and Thompson. Our reversal as to probable cause leaves the issue of malice unclear in this record. While malice may be inferred from lack of probable cause it must be noted that under *Roberts v. Federal Express Corp.*, 842 S.W.2d 246 (Tenn. 1992), malice is individualized and subjective rather than objective. The question of malice therefore must be addressed in the first instance by the trial court, including whether or not malice is to be inferred from lack of probable cause under the facts of this case. It is also well to note that although damages from malicious prosecution may be difficult to separate from damages for defamation, such must be done as Stace Thompson cannot be held liable for defamation but only if the trial court finds him guilty of malice in the malicious prosecution case and then only for such damages as are proximately attributable to the malicious prosecution.

The judgment of the trial court is affirmed in part, reversed in part, and remanded for further proceedings in conformity with this opinion. Costs of this cause are assessed two-thirds against Don Pickard and one-third against Stace Thompson.

_____
WILLIAM B.  CAIN, JUDGE